# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ALFRED FLORES III,
Defendant and Appellant.

S116307

San Bernardino County Superior Court
FVA-015023

May 4, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, and Groban concurred.

Justice Liu filed a concurring and dissenting opinion, in which Justice Cuéllar concurred.

PEOPLE v. FLORES

S116307

Opinion of the Court by Kruger, J.

A jury found defendant Alfred Flores III guilty of the first degree murders of Ricardo Torres, Jason Van Kleef, and Alexander Ayala. (Pen. Code, § 187, subd. (a).) It found true the special circumstance allegation of multiple murder (*id.*, 190.2, subd. (a)(3)), as well as the sentence enhancement allegations that defendant had personally discharged a firearm to commit each murder (*id.*, § 12022.53, subd. (d)). Following the penalty phase, the jury returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We affirm.

## I. BACKGROUND

### A. Guilt Phase

Over the course of three consecutive days in March 2001, the bodies of three teenage boys were discovered at three separate locations in San Bernardino County. The victims were subsequently identified as Torres, Van Kleef, and Ayala.

#### 1. Evidence

##### a. Discovery of Torres's Body

After dark on March 19, 2001, Anita Rita Saldana and her teenage daughter, Sheila Leyerly, were passengers in a car driving uphill on Lytle Creek Road toward Lytle Creek. Saldana, sitting in the front passenger seat, noticed a Chevrolet Astro van parked facing downhill in a dirt pull-off area on the

opposite side of the two-lane road. According to Saldana, three or four Latino men stood outside, by the side of the van facing Lytle Creek Road. One appeared to her to be about 40 years old. It looked like they were drinking. One of the men was wearing an oversized white T-shirt.

Approximately 15 minutes later, Saldana and Leyerly traveled in their car back toward where they had seen the van. When they passed the area where the van had been parked, Leyerly spotted a white tennis shoe. Saldana's husband, who was driving, pulled over and shined the car's headlights, which illuminated a dead body. Saldana and Leyerly both recognized the victim as one of the people they had seen standing by the van in that same area 15 minutes earlier. Saldana told police she thought the victim had been standing next to the man wearing the white T-shirt.

The victim was 15-year-old Ricardo Torres. Torres had been shot seven times, including twice in the back of the head. Crime scene personnel found a pair of eyeglasses, a plastic Pepsi bottle, a cigarette butt, multiple nine-millimeter shell casings, and one live round near Torres's body. No fingerprints were found on any of these items. Crime scene personnel also noted and photographed tire tracks and shoe prints near the body. The presence of shell casings and blood pooling underneath the body suggested Torres had been shot at the scene.

### b. Discovery of Van Kleef's Body

Shortly after midnight on March 20, 2001, Tamara Phoenix was returning a tractor trailer to the trucking yard where she worked on Willow Avenue in Rialto. As she drove up the yard's dark driveway, her headlights revealed a dead body. Phoenix called the police.

2

The body belonged to 18-year-old Jason Van Kleef. Van Kleef had been shot once in the back of the head at close range. The size of the wound suggested a larger caliber weapon, such as a .38-caliber, .357-caliber, or nine-millimeter handgun. Van Kleef was wearing Etnies tennis shoes. Etnies-pattern shoe prints had been found at the Torres murder scene. Van Kleef's body was on top of a size XXL Stafford-brand white T-shirt and under a thin blue sheet. There were no bullet casings or signs of struggle at the scene, which suggested to investigators that Van Kleef had been killed elsewhere and then moved to where he was found. Crime scene personnel noted and photographed tire tracks arcing toward Van Kleef's body.

### c. Discovery of Ayala's Body

At approximately 6:40 a.m. on March 21, 2001, Brenda Horton was driving her children to school when she noticed a body on the side of Lytle Creek Road. The body was approximately two-tenths of a mile from the location where Saldana and Leyerly had found Torres's body. Horton's son called 911.

The body belonged to 17-year-old Alexander Ayala. Despite cold weather, Ayala was found wearing only a white tank top and blue denim jeans. He had been shot five times, including twice in the head. Crime scene personnel found nine-millimeter cartridge casings and a fired bullet in a pool of blood. They also noted and photographed tire tracks curving toward the location where they believed Ayala had been shot.

### d. Connection Between Victims and Defendant

Police investigation revealed all three victims were friends of 17-year-old Andrew Mosqueda, a member of the El Monte Trece gang. Mosqueda and his friends regularly spent time at

3

an apartment on Linden Avenue in Rialto. The apartment was rented by Mosqueda's aunt, Carmen Alvarez, and her husband, Abraham Pasillas. Alvarez and Pasillas were also members of the El Monte Trece gang. They claimed they were not active in the gang at the time of the murders but admitted to associating with El Monte Trece gang members and attending gang gatherings.

Defendant was also a member of the El Monte Trece gang. He had been "jumped into" the gang at a young age and was known as either "Casper" or "Wizard." He was friends with Alvarez and Pasillas. Starting in early 2001, he frequently stayed the night at their apartment. He kept some personal belongings in the master bedroom closet.

According to Alvarez, Pasillas, and Mosqueda, defendant sought to recruit new members to El Monte Trece, including Mosqueda and his friends. Pasillas told defendant he wanted no part in any recruitment effort, and Alvarez told defendant that Mosqueda and his friends were not "gang member types." Defendant nonetheless successfully recruited Mosqueda. Mosqueda was given a gang name ("Apache") and started taking orders from defendant.

Torres, Van Kleef, and Ayala were not members of El Monte Trece. Van Kleef and Ayala had no interest in gang membership. Torres had agreed to join the gang but then did not attend his jumping-in ceremony. According to Mosqueda, this "disappointed" defendant. Mosqueda claimed to have attended the jumping-in ceremony in Torres's stead.

### e. Torres's Murder

Mosqueda and Alvarez both claimed to have been present when defendant killed Torres. They testified under grants of use immunity.

On the evening of March 19, 2001, defendant, Mosqueda, Van Kleef, Torres, Ayala, and another friend, Erick Tinoco, were at Alvarez's apartment. At some point, defendant suggested they take a ride to Lytle Creek in Alvarez's Astro van. Privately, defendant told Mosqueda to put a gun in the van; he did not say why. Defendant handed Mosqueda a rifle wrapped in a towel and Mosqueda put it in the back of the van.

With Alvarez as their driver, defendant, Mosqueda, Torres, and Van Kleef entered the van. Tinoco and Ayala left separately. With the four boys in the van, Alvarez drove to an ampm convenience store where she purchased beer.

Alvarez then drove up Lytle Creek Road before pulling over into a dirt pull-off area. Everyone except Alvarez got out and began drinking beer by the back of the van. Mosqueda and Van Kleef chatted, while Torres and defendant had a separate conversation. Mosqueda heard defendant say to Torres, "Hey, don't you trust me?" Torres put his arm around defendant. Defendant suddenly shot Torres in the stomach and continued to shoot Torres after he fell to the ground.

Defendant, Mosqueda, and Van Kleef returned to the van, and Alvarez started driving. Alvarez testified that defendant was holding what looked like a pistol when he returned to the van. Alvarez dropped defendant and Van Kleef off near her apartment, then drove Mosqueda to his home. Defendant and Van Kleef were at Alvarez's apartment when she returned. Van Kleef then left the apartment; defendant followed within a few

minutes, holding Alvarez's car keys. Defendant returned after about an hour. He told her that "he had gotten into an argument or something and . . . somebody broke the window" of her van on the front passenger's side; she and Mosqueda both saw that the window was damaged. Mosqueda described the damage as a "bullet hole."

Defendant followed Alvarez around throughout the next day and threatened to harm her family. She testified she thought defendant would hurt her or her family if she called the police. Around 11:00 p.m. that night, defendant again borrowed Alvarez's van and left for about an hour. Ayala was found early the next morning, shot on the side of the road about two-tenths of a mile from where Torres was found. Ayala was last seen by his sister at their house around 11:00 p.m.; he was dressed for bed and said he was in for the night.

After the police started investigating the murders, defendant left the United States for Mexico. He reportedly was staying at the home of one of Alvarez's relatives. Detectives traveled to Mexico to find defendant, the van, and the murder weapon. They did not locate defendant but saw the van, which was later burned.

On a second trip to Mexico, detectives traveled with Alvarez's mother, Maria Jackson, who was helping with the investigation. The detectives and Jackson there met with Jackson's nephew, who said he had the murder weapon—a nine-millimeter handgun. Jackson paid her nephew $100 for the handgun, and the detectives reimbursed her. The gun was in a plastic bag, but two of the detectives removed it briefly to check if it was loaded. One of these detectives was a Mexican detective, Trini Cambreros, who was assisting in the

investigation. Jackson said she told him his fingerprints would now be all over the gun. Then, according to Jackson, Cambreros "got a blanket, a sheet that was on the bed, and wipe [*sic*] it off and put it back in the plastic bag and put it on my purse." Criminalist Kerri Heward later testified for the prosecution that the nine-millimeter handgun recovered from Mexico matched bullets found at the Ayala and Torres crime scenes.

Defendant was later arrested trying to cross the border from Mexico into the United States. He used a false name, but agents discovered his identity by running his fingerprints. A border patrol agent asked defendant if he was "the Wizard." He replied, "You guys got me. You found me out . . . ."

### 2. *Arguments*

The prosecution's theory was that defendant killed Torres for refusing to join the gang. Then defendant killed Van Kleef because he witnessed the Torres murder. Defendant likewise killed Ayala to prevent him from implicating defendant in the Torres murder; the prosecution theorized that defendant was concerned Ayala had learned about the murder from his good friend Mosqueda, who had also witnessed the murder but was a member of the gang.

The defense argued defendant was a scapegoat and did not shoot the three boys. Pasillas, Alvarez, and Mosqueda—all of whom had testified against defendant—were instead to blame. The defense argued Alvarez and Pasillas were the gang members in control and that Pasillas or Mosqueda shot the boys.

The jury convicted on all three counts.

### B. Penalty Phase

#### 1. Aggravating Evidence

At the penalty phase, the prosecution presented evidence that defendant had committed multiple crimes unrelated to the three murders:  that he had brandished a gun while driving by a birthday party; assaulted a correctional counselor while a ward at a youth correctional facility; participated in the nonfatal shooting of his former girlfriend; stabbed his sister's boyfriend with an ice pick; and committed two armed robberies with other El Monte Trece gang members, during which innocent people were shot.  Also, while he was in custody awaiting trial in this case, deputies found defendant with a "slashing type weapon"— a toothbrush with a razor attached.

The aggravation case also included evidence that defendant had committed another murder, that of Mark Jaimes. Jaimes's body was found in the trunk of a car belonging to Rick Milam.  Milam had hired defendant's mother as a prostitute and was with her at a motel when his car disappeared from the parking lot.  Jaimes's body was discovered when the car was recovered.

Lieutenant Roderick Kusch of the Los Angeles Police Department, who investigated the Jaimes murder, conducted an interview with defendant.  A videotape of that interview was played for the jury.

During the interview, defendant said he went to the motel room where his mother lived and found Jaimes there, seemingly taking drugs.  Defendant asked him to leave but he would not leave and was "disrespecting" and "coming at my mom." Defendant told Kusch: "I murdered him ey.  I did it.  All right? And I enjoyed doing it ay.  I'm gonna tell you why, because it

was defending my mother." Defendant later said, "I pulled out my gun and I blew his fucking head off ay."

The prosecution also introduced evidence of the impact of the victims' deaths on the Torres, Van Kleef, and Ayala families. Torres's sister testified that her brother was "very smart" and a "[v]ery happy boy," who "loved taking pictures," and their father testified about how his son's death had "destroyed the family." Van Kleef's sister testified about how hard it was not having him around for holidays; their father spoke about Van Kleef's dream to serve in the military and as a firefighter; and their mother testified about how her son "thought a lot about people" and "wanted to help people" and about how difficult it has been for her and her family since his death. Ayala's sister said Ayala "always had a smile on his face," "was really smart" and "caring," and "loved playing with his nieces and nephews"; he "wanted to go to school to become a computer technician." Ayala's mother testified Ayala "was [her] life."

### 2. Mitigating Evidence

The defense presented evidence concerning prison conditions for prisoners sentenced to life without the possibility of parole. Retired San Quentin State Prison Associate Warden Anthony Casas testified that such prisoners are held at top security level 4, have little access to educational and work opportunities, and do not have conjugal visits. He also testified there had never been an escape from one of the new level 4 institutions, where defendant would have been housed.

Retired Police Officer Steven Strong testified as an expert on Hispanic street gangs in Los Angeles. He explained that many gang members come from families where the parents may be drug dealers, prostitutes, or incarcerated and that the gang

provides food and other things for the members that they cannot get from their families. He testified that defendant had an unstable childhood and that the only time defendant had stability was when he joined the gang and started living with Pasillas at age 11 or 12. Defendant's mother and father were both incarcerated, leaving defendant with "no other . . . examples to learn from or see." Strong testified that, for defendant, the gang is "all he knows."

## II. JURY SELECTION ISSUES

### A. Stipulated Prescreening of Jurors Based on Questionnaire

Before jury selection began, the parties stipulated to a juror prescreening procedure that defendant now challenges on appeal. According to the agreed-upon procedure, prospective jurors first filled out a hardship questionnaire. The parties then stipulated that certain jurors could be excused for hardship based on their answers. Remaining jurors completed a different, case-specific questionnaire. The parties reviewed the case-specific questionnaires and stipulated that certain jurors should be removed for cause or hardship before voir dire. The court excused these jurors before the parties continued with jury selection.

Defendant argues this prescreening procedure violated Code of Civil Procedure sections 222 and 223. Section 222, subdivision (a) requires courts to "randomly select the names of the jurors for voir dire, until the jury is selected or the panel is exhausted." Section 223, subdivision (a) says, "[T]he trial judge shall conduct an initial examination of prospective jurors." Finally, defendant invokes Civil Code section 3513, which provides: "Any one may waive the advantage of a law intended

solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." Defendant argues that sections 222 and 223 were enacted for a public reason, and his agreement to the prescreening procedure therefore should not have been given effect.

Our cases have consistently rejected similar challenges to the excusal of jurors under similar mutually agreed-upon prescreening procedures. "A court may allow counsel to screen juror questionnaires and stipulate to juror dismissals." (*People v. Duff* (2014) 58 Cal.4th 527, 540 (*Duff*); accord, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 159.) Further, "a stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool." (*Duff*, at p. 540.)

Here, by agreeing to the prescreening procedure he now challenges, defendant has forfeited the claim. (E.g., *People v. Ervin* (2000) 22 Cal.4th 48, 73.) In any event, the claim lacks merit. Contrary to defendant's argument, neither Code of Civil Procedure section 222 nor section 223, subdivision (a) forbids the prescreening procedure employed in this case. Section 222 requires random selection of prospective jurors for voir dire but says nothing about prescreening through a questionnaire. Section 223, subdivision (a), which requires the trial court to conduct an initial examination of prospective jurors, does not bar the court from exercising its discretion to allow counsel to prescreen jurors and stipulate to dismissals. (*People v. Benavides* (2005) 35 Cal.4th 69, 88–89.)

Defendant makes a number of related additional arguments, which we also reject. He argues the prescreening procedure allowed the parties "to trade discriminatory removal[s] of potential jurors," as well as to create a jury not

selected from a fair cross-section of the community. But defendant has not alleged that any of the stipulated removals were discriminatory, nor does he adequately explain how permitting him to stipulate to the dismissal of certain jurors could have undermined his right to trial by a jury selected from a fair cross-section of the community. Defendant also claims the prescreening procedure "frustrates the public policy requiring that voir dire be open to the public." (See, e.g., *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 508–509.) But voir dire in this case was open to the public; the trial court simply permitted the parties to stipulate to the removal of certain jurors based on their written questionnaire responses. Having agreed to this procedure, defendant may not now complain that it violated his right to a public trial. (See *People v. Edwards* (1991) 54 Cal.3d 787, 813.)

## B. Dismissal of Prospective Juror for Cause

Defendant contends the trial court erred by excusing Prospective Juror S.M. for cause during the death-qualification portion of jury selection. Defendant contends the excusal of S.M. violated his state and federal constitutional rights to due process of law, to a fair and impartial jury, and to a reliable penalty verdict. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.) We discern no error.

" 'A prospective juror in a capital case may be excluded for cause if his or her views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].)' " (*People v. Rices* (2017) 4 Cal.5th 49, 78.) "Both this court and the United States Supreme Court have cautioned that

mere personal opposition to capital punishment is an insufficient basis on which to justify dismissal of a juror during jury selection." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1064 (*Thompson*).) " '[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " (*People v. Jones* (2017) 3 Cal.5th 583, 614 (*Jones*), quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176.)

"That prospective jurors are not always clear in articulating their beliefs (or accurately assessing their ability to set aside those beliefs) is a difficulty trial and appellate courts frequently encounter in capital cases." (*Thompson, supra,* 1 Cal.5th at p. 1065.) " ' " "[I]n many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected.' " ' " (*Ibid.*) For this reason, a prospective juror's bias against the death penalty need not be demonstrated with " 'unmistakable clarity.' " (*Jones, supra,* 3 Cal.5th at p. 615; see *People v. Bramit* (2009) 46 Cal.4th 1221, 1235 (*Bramit*) [" ' "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings" ' "].) " 'Instead, after examining the available evidence, which typically includes the juror's written responses in a jury

questionnaire and answers during voir dire, the trial court need only be left with a definite impression that the prospective juror is unable or unwilling to faithfully and impartially follow the law.' " (*Jones*, at p. 615, quoting *Thompson*, at p. 1066.)

On appellate review, we recognize that " 'in assessing a prospective juror's true state of mind, the trial court occupies a superior position vis-à-vis an appellate court, for the former court is able to consider and evaluate a juror's demeanor during voir dire.' " (*Jones, supra*, 3 Cal.5th at p. 615; see also *ibid.* [" ' " ' "[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor) . . . gleans valuable information that simply does not appear on the record" ' " ' "].) " 'Accordingly, the trial court's ruling regarding the juror's true state of mind is entitled to deference on appeal if supported by substantial evidence.' " (*Ibid.*; see *Bramit, supra*, 46 Cal.4th at p. 1235.)[1] Applying these principles, we conclude that substantial evidence supports the trial court's decision to dismiss S.M. for cause.

In his responses to the juror questionnaire, S.M. acknowledged he had reservations about imposing the death

---

[1] Defendant argues that this approach is outdated and inconsistent with the United States Supreme Court's holdings in *Adams v. Texas* (1980) 448 U.S. 38 and *Gray v. Mississippi* (1987) 481 U.S. 648. The argument lacks merit. The Supreme Court has long emphasized deference to a trial court's "determinations of demeanor and credibility" (*Wainwright v. Witt, supra*, 469 U.S. at p. 428; see *Darden v. Wainwright* (1986) 477 U.S. 168, 178) and has continued to do so following *Adams* and *Gray* (see *Uttecht v. Brown* (2007) 551 U.S. 1, 9).

penalty. When asked to select from among five responses the one that most clearly aligned with his view on the death penalty, S.M. chose, "I have doubts about the death penalty, but I would not vote against it in every case." Elsewhere, S.M. indicated he had "moral[,] philosophical, or religious" objections to capital punishment and that his decisionmaking was "greatly" influenced by his moral preferences. He further wrote that the death penalty should be used "sparingly," only "where an individual is beyond compunction," and "for the most heinous of crimes." And when asked to "list any biases you may have that could interfere with your ability to be an impartial juror if selected to sit on this case," S.M. wrote: "Imposition of the death penalty."

Though S.M. indicated in response to one question that he believed the death penalty law in California is fair, in response to another he said he had "reservations about [the death penalty's] effectiveness to deter crime, [and its] fairness." And, despite having checked "[n]o" when asked whether he would be reluctant to state a death verdict in open court, he checked "[y]es" when asked whether he would be reluctant to vote for a sentence of death or personally sign the verdict form.

Along with these reservations, however, S.M. expressed the view that he could faithfully follow the law. Indeed, he stated both that he would not automatically vote for life without the possibility of parole and that he could "weigh the evidence and the circumstances" to select a sentence. He further stated he could consider both the death penalty and life without parole as a "realistic and practical possibility" (underscoring omitted) for an individual found guilty of three separate killings, with the handwritten elaboration that the ultimate sentence rendered would "[d]epend[] on the degree of severity of the crime."

When asked to elaborate on his views of the death penalty at voir dire, however, S.M. grew more equivocal about his ability to fairly apply the law. When questioned by the prosecutor, S.M. maintained he could be fair and impartial but said he would be "reluctant to impose the death penalty[,]" raised concerns regarding recent exonerations based on DNA evidence, and agreed that sitting on the jury would put him in a "moral dilemma." When asked if his concerns might "carry over in the guilt portion of the trial," he said it was "possible," but "it would be hard to say," since this was the first time he had been in such a situation.

When questioned by the defense, S.M. continued to vacillate on his ability to follow the law as given and impose the death penalty. Although S.M. said he could "consider those different factors" per the court's sentencing instructions and impose the death penalty in an "appropriate case," he also stated he did not "know if [he] could in good conscience vote [for] the death penalty." He expressed a belief that the death penalty is appropriate "for the most heinous of crimes" but acknowledged that he was "still in the process of soul searching" to determine "what that is." When asked if he could impose the death penalty in a case involving a multiple murder special circumstance, he said: "I'm trying to decide whether I agree with if something is indeed a special circumstance, you know. I understand the law defines it one way, but I have to look within and decide whether I can use that factor in determining whether I can take someone's life or vote that someone's life be taken."

At the conclusion of defense counsel's questioning, the prosecution challenged S.M. for cause. The trial court granted the challenge over defense objection "based on what [it] heard" during voir dire.

16

The record reveals no error in the trial court's determination that S.M.'s views on capital punishment would have substantially impaired his performance as a juror. When asked about his ability to set aside his personal views and follow the law, S.M. gave equivocal and inconsistent answers. At times he professed he could do so, but he also stated in his written questionnaire that "[i]mposition of the death penalty" was one of his "biases" that "could interfere" with his "ability to be an impartial juror." When questioned further at voir dire, S.M. acknowledged he was not sure he could "in good conscience" vote for death and agreed that serving as a juror in a capital case would put him in "a moral dilemma." Defendant argues that these responses demonstrate only that S.M. had reservations about the death penalty, not that he would face substantial difficulties in considering death as a potential option. This is one possible conclusion to be drawn from S.M.'s statements, but it is not the only possible conclusion. Another possible conclusion was that S.M. did " ' "not know how [he would] react when faced with imposing the death sentence" ' " (*Bramit*, *supra*, 46 Cal.4th at p. 1235), but in the end he would not, "in good conscience," realistically be able to consider voting in favor of death. (Compare, e.g., *People v. Spencer* (2018) 5 Cal.5th 642, 659 [affirming dismissal of juror who "mentioned his 'reluctance about the death penalty' as something which may affect his ability to be a juror or his participation as a juror in this trial"]; *People v. Wash* (1993) 6 Cal.4th 215, 255 [affirming dismissal of juror who "initially denied she had any feelings about the death penalty that would affect her decision" but then "consistently responded, 'I don't know' in answer to the question whether she was capable of voting for death"].)

Where, as here, a juror gives ambiguous responses, it is for the trial court to resolve that ambiguity in the first instance. In such cases we " 'defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 696.) The trial court was in the best position to observe S.M.'s demeanor, vocal inflection, and other cues not readily apparent on the record, and we reasonably infer that the trial court based its decision not only on what S.M. said, but also on how he said it. (See *People v. Clark* (2011) 52 Cal.4th 856, 897 (*Clark*) ["Although at the end of the voir dire questioning L.C. expressed greater certainty concerning his ability to vote for the death penalty in an appropriate case, the court was entitled to find those assurances were severely undercut by his demeanor and his hesitant, inconsistent, and equivocal responses"]; *People v. Watkins* (2012) 55 Cal.4th 999, 1016 [inferring that trial court reached its conclusion based on juror's demeanor and responses]; accord, e.g., *Thompson, supra*, 1 Cal.5th at p. 1070.) Given the trial court's careful conduct of jury selection, we have no basis to doubt the trial court applied the appropriate standard in determining that S.M. was subject to excusal for cause. Even though S.M. also made other statements that, viewed in isolation, " 'might have warranted keeping [him] as [a juror],' " the record as a whole includes substantial evidence to support the trial court's definite impression that S.M. would not be able to faithfully and impartially apply the law. (*People v. Martinez* (2009) 47 Cal.4th 399, 431 (*Martinez*); see *People v. Thornton* (2007) 41 Cal.4th 391, 414 (*Thornton*).) The record thus supports the court's exercise of discretion in dismissing S.M. for cause.

## C. Alleged Unfairness in Applying *Witt* Standard

Defendant contends the trial court failed to apply the *Witt* standard impartially and evenhandedly to both "pro-death" and "pro-life" prospective jurors and that the court thereby violated of his state and federal constitutional rights. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.) In particular, defendant alleges the court treated S.M., who had doubts about the death penalty, differently than it treated Prospective Jurors L.T., D.S., and S.T., who favored the death penalty. He maintains that the court selectively and leadingly questioned these "pro-death" jurors to rehabilitate them and did not accord the same treatment to S.M. Defendant argues the trial court's conduct resulted in a jury " 'uncommonly willing to condemn a man to die.' " (Quoting *Witherspoon v. Illinois* (1968) 391 U.S. 510, 521.) The argument lacks merit.[2]

---

[2] The Attorney General asks us to reject defendant's claim on the ground that it has been forfeited because defendant failed to make the same objection in the trial court. We have, however, previously exercised our discretion to address the merits of similar claims despite the defendant's failure to object below. (See, e.g., *Clark, supra,* 52 Cal.4th at p. 902, fn. 10; *Martinez, supra,* 47 Cal.4th at p. 439, fn. 8.) We will do so again here.

To the extent defendant intends to separately challenge the trial court's decision not to dismiss Prospective Jurors L.T., D.S., and S.T. for cause, that claim has not been preserved. Generally speaking, to complain on appeal of a denial of a challenge for cause, a litigant must "exercise a peremptory challenge and remove the prospective juror in question," "exhaust all of the peremptory challenges allotted by statute and hold none in reserve," and "express to the trial court dissatisfaction with the jury as presently constituted." (*People v. Mills* (2010) 48 Cal.4th 158, 186 (*Mills*); cf. *People v. Black*

We agree with defendant that "trial courts should be evenhanded in their questions to prospective jurors during the 'death-qualification' portion of the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors." (*People v. Champion* (1995) 9 Cal.4th 879, 908–909.)  But trial courts have " 'broad discretion over the number and nature of questions about the death penalty.' "  (*Mills, supra*, 48 Cal.4th at p. 189.)  We presume "the trial court formulated its questions based on the individual characteristics of each juror, including the juror's questionnaire answers and in-court demeanor."  (*Id.* at p. 190.)  "To second-guess these choices would encourage the trial court to engage in substantially the same questioning of all prospective jurors irrespective of their individual circumstance, something we have declined to do." (*Ibid.*, citing *Thornton, supra*, 41 Cal.4th at p. 425.)  Accordingly, an argument "based solely on a numerical counting of questions" asked to "pro-death" and "pro-life" jurors "is not sufficient to establish a constitutional violation." (*People v. Navarette* (2003) 30 Cal.4th 458, 487; see *Mills*, at p. 190, citing *Thornton*, at p. 425.)

---

(2014) 58 Cal.4th 912, 920 (*Black*) ["When a defendant uses peremptory challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges and an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case"].)  Here, defendant exercised peremptory challenges to remove each of the three jurors, but never asked for more challenges nor otherwise expressed dissatisfaction with the jury as constituted.  Defendant therefore did not preserve this challenge to the trial court's rulings for appellate review.

In his effort to establish judicial bias, defendant points to the trial court's questioning of three prospective jurors. Defendant claims the questioning of these three individuals demonstrates the court's bias toward the death penalty. But three prospective jurors "constitutes an extremely limited sample of the trial court's overall performance, thereby diminishing the probative value of the examples proffered by defendant to support the inference" that the court made a greater effort to rehabilitate pro-death penalty jurors. (*Martinez*, *supra*, 47 Cal.4th at p. 447.) Review of the record as a whole shows the trial court rehabilitated both "pro-death" and "pro-life" jurors and sometimes elected not to intervene because counsel's questioning rendered further questioning unnecessary. The trial court on multiple occasions questioned prospective jurors who expressed reluctance about or opposition to the death penalty and determined they were fit to serve. On other occasions, the court declined to question prospective jurors who expressed leanings in favor of the prosecution and later dismissed them for cause at defendant's request.[3]

---

[3] For example, the trial court questioned the following prospective jurors, with the results indicated: D.J., denying the prosecution's challenge for cause despite juror's initial statement that she did not believe she could impose the death penalty; V.B., denying prosecution's challenge for cause despite V.B.'s skepticism of the death penalty; T.P., excusing pro-law enforcement juror for cause; V.D., denying prosecution's challenge for cause despite the appearance of an intent to hold the prosecution to a higher standard than beyond a reasonable doubt; S.C., dismissing prospective juror for cause after she said she believed the only appropriate penalty for three murders is death, despite her claim that she could follow the law; R.H., denying the prosecution's challenge for cause despite her

But even if we focus exclusively on the three prospective jurors on whom defendant trains his attention, the record does not support defendant's allegations of judicial bias. Having carefully reviewed the record of voir dire, we see no lack of evenhandedness or impartiality in the court's questioning of L.T. and S.T. to clarify their ability to follow the law. The trial court did not question D.S., but we see nothing untoward in that decision either. In his written responses to the questionnaire, D.S. indicated a belief that the death penalty is appropriate when imposed on criminals who would kill again. When questioned further by both the defense and prosecution, D.S. stated he could consider both death and life without parole and that he would be as fair and impartial as possible. Given the general consistency of his answers to both attorneys during voir dire, the trial court evidently concluded there was no need to ask further questions to clarify D.S.'s views. In denying defendant's challenge for cause, the trial court explained that "after both attorneys had an opportunity to ask [D.S.] in person about his feelings, he made it very clear he can remain open minded and fair and base his decision on what the evidence and the laws are and what he is instructed on."

Defendant argues that the trial court's decision to excuse S.M., despite S.M.'s similar responses about impartiality, and

statement that she would "need to be 100 percent" before imposing the death penalty or convicting defendant; R.B., denying the prosecution's challenge for cause, despite her statement that she could vote for death but could not announce it to defendant in open court; and J.D., denying the prosecution's challenge for cause after J.D., who previously indicated he could not impose the death penalty based on the beyond a reasonable doubt standard, stated he could follow the law.

without questioning S.M. further, demonstrates a lack of evenhandedness. But as discussed above, S.M.'s answers were equivocal and inconsistent. In response to the attorneys' questioning, S.M. at times indicated he was willing to consider both penalty options but also expressed substantial qualms about the possibility of imposing a sentence of death and questioned his own ability to accept the law's determination about the crimes warranting a potential death sentence. The trial court, having observed both these responses and S.M.'s demeanor, acted within its discretion in concluding that "further questioning was not likely to render [S.M.] qualified to sit in a capital case." (*Mills*, *supra*, 48 Cal.4th at p. 190; see *Thornton*, *supra*, 41 Cal.4th at p. 423 [finding "nothing improper in the court's explaining the law to the prospective juror, nor in its failing to engage in a similar dialogue with other prospective jurors whose voir dire did not give rise to the same concerns"].)

In sum, we see no basis for defendant's claim that the trial court disproportionately attempted to rehabilitate and retain jurors with pro-death penalty views. The record instead shows that the trial court carefully evaluated jurors on an individual basis.

Although that conclusion suffices to dispose of defendant's argument, we also note that defendant fails to support his claim that the trial court's purported lack of evenhandedness in voir dire affected the fairness of the jury that sat on his case. None of the three "pro-death" jurors at issue served on the jury; defendant was able to remove all three by peremptory strike or stipulation. "If no biased or legally incompetent juror served on defendant's jury, the judgment against him does not suffer from a federal constitutional infirmity . . . ." (*Black*, *supra*, 58 Cal.4th at p. 917.) Here, defendant fails to show that any empaneled

jurors were biased in favor of death. He likewise fails to show that the trial court's handling of Prospective Jurors L.T., D.S., and S.T. undermined his constitutional right to an impartial jury.

## III. GUILT PHASE ISSUES

### A. Denial of Motion To Exclude Firearm Evidence or To Instruct Jury on State's Bad Faith Destruction of Evidence

During their investigation, San Bernardino detectives twice traveled to Mexico in search of defendant and evidence related to the homicides. On their second trip, Detectives Chris Elvert and Robert Acevedo were accompanied by Maria Jackson, Alvarez's mother and Mosqueda's grandmother. Jackson had told the detectives that her nephew, who lived in Mexico, could purchase from a third party the nine-millimeter handgun allegedly used in the homicides and deliver it to her. The detectives picked up Jackson in Southern California and drove across the border to Tijuana, where they met Cambreros, a Mexico-based detective. Jackson recalled that, before they all drove to meet her nephew, the three men discussed whether Cambreros should return the handgun to Mexican authorities and "go through some kind of paperwork for permission from the governments," but they decided to retrieve it informally instead.

The testimony at trial was uncontroverted that Elvert offered Jackson's nephew $100 in cash for the handgun, but Jackson's nephew refused to accept the money for fear that it was marked. Jackson's nephew instead agreed to accept $100 from Jackson, and Elvert later reimbursed her. Jackson, Elvert, and Acevedo all testified that Jackson's nephew retrieved the handgun, which was in a plastic bag, and placed it in Jackson's purse. At that point, however, their testimony diverged.

24

Jackson, who was called as a witness for the prosecution, testified that Acevedo pulled the handgun out of Jackson's purse to see if it was loaded and then handed it to Cambreros, who "was handling it too and trying to see if it work[ed]." Jackson recalled telling Cambreros that "now the gun is going to have all kinds of fingerprints" on it, at which point Cambreros "got a blanket . . . and wipe[d] [the gun] off and put it back in the plastic bag and put it [in] my purse." According to Jackson, the handgun then remained in her purse until she reached the border with Elvert and Acevedo.

The detectives provided different accounts. Elvert testified that the handgun remained in Jackson's purse until "we came back to [the] United States and then myself and Acevedo took possession of that weapon." He further testified that the handgun was never wiped down by Cambreros; but on redirect examination, he acknowledged that Cambreros "could have" touched the handgun even though he "did not see that."

Acevedo testified Jackson gave him the nine-millimeter handgun immediately before they crossed the border into the United States. He recalled that Cambreros "inspected" the handgun before it was placed in Jackson's purse, but he said he never saw Cambreros wipe it down. On cross-examination, Acevedo reiterated that "[i]f [Cambreros] wiped the gun off, I didn't see it."

At one point, Acevedo instructed Jackson not to mention Cambreros's name to anyone, because Cambreros "did not want to be subpoenaed" in the United States. Acevedo testified he "could understand that" because "[i]t's very difficult for officers to come across" the border. Acevedo also testified that, before

returning to the United States, Elvert placed $100 in Cambreros's pocket and said, "This is for your expenses."

The nine-millimeter handgun was later tested for DNA. A criminologist testified she identified DNA material from multiple people on the inner slide of the handgun. She compared the recovered material to DNA samples that had been collected from defendant, Pasillas, Alvarez, Mosqueda, Torres, Van Kleef, and Ayala. All of the tested individuals, including defendant, were excluded as possible contributors, except for Pasillas and Van Kleef. No useable fingerprints were found on the gun.

Criminalist Kerri Heward also test-fired the handgun and compared the bullets and cartridge casings from the test-fire to those found at the crime scenes. She ultimately determined that the cartridge cases from the Torres and Ayala crime scenes came from the nine-millimeter handgun retrieved in Mexico.

Defendant filed a motion to dismiss. He also moved to suppress the handgun, any testimony as to its use and recovery, and the ballistics evidence comparing the handgun and recovered casings. In the alternative, defendant asked that the jury be instructed on the government's bad faith destruction of evidence. He claimed the police manipulated and destroyed evidence, as well as violated the Mutual Legal Assistance Treaty with Mexico. And he argued the destroyed evidence would have been exculpatory because fingerprints on the handgun could have excluded him and instead inculpated Pasillas, Alvarez, or Mosqueda. Had the detectives recovered the handgun through formal channels, defendant argued, Cambreros would have had no reason to wipe down the handgun, and more prints would

have been found tying the alleged murder weapon to other suspects.

On appeal, defendant challenges the court's denial of this motion. We view the evidence in the light most favorable to the trial court's ruling and review its decision for substantial evidence. (*People v. Montes* (2014) 58 Cal.4th 809, 837; *People v. Roybal* (1998) 19 Cal.4th 481, 510 (*Roybal*).)

The principles that guide our analysis are well established. Law enforcement agents have a constitutional duty to preserve evidence, but that duty is limited to "evidence that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488.) To reach this standard of "constitutional materiality," the "evidence must both possess an exculpatory value that was apparent before [it] was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at p. 489; accord, *People v. Carter* (2005) 36 Cal.4th 1215, 1246.)

The defendant bears a higher burden to establish a constitutional violation when "no more can be said" of the evidence "than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 (*Youngblood*).) In such cases, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58; accord, *Duff, supra*, 58 Cal.4th at p. 549.) The assessment of bad faith "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood*, at p. 57, fn. *.)

We have had several occasions to consider the constitutional materiality of fingerprint evidence that law enforcement fails to preserve. (E.g., *Roybal, supra*, 19 Cal.4th 481; *People v. DePriest* (2007) 42 Cal.4th 1; *People v. Medina* (1990) 51 Cal.3d 870.) In *Roybal*, the defendant claimed the prosecution destroyed exculpatory evidence when it lost a doorjamb that was photographed and removed from the crime scene after an " 'orangish-red' " print was found on it. (*Roybal*, at p. 498.) Witnesses for both sides testified that the print, as captured in the photograph, did not match the defendant's fingerprints. On appeal, the defendant argued he was deprived of the opportunity to inspect the doorjamb and enhance the print, which he claimed " 'was believed to have been made by the person who committed the homicide or by a person involved.' " (*Id.* at p. 508.) But we held there was no discernable exculpatory potential in the print at the time the doorjamb disappeared. Simply put: "[T]he print may or may not have been defendant's and may or may not have been the perpetrator's." (*Id.* at p. 510; see also *DePriest*, at p. 41 [exculpatory value of fingerprints not apparent when the prosecution failed to retain the victim's car, which contained "three unidentified fingerprints that could have been made by . . . the person who supposedly killed [the victim] and stole her car"]; *Medina*, at p. 893 [fingerprint on water bottle at crime scene was not constitutionally material because the investigator "could not know at the time the prints were taken whether, or to what extent" they matched the defendant's].)

Similarly here, any potentially exculpatory value in prints (or DNA) on the nine-millimeter handgun would not have been apparent at the time Cambreros was said to have wiped it

down.[4] Like the fingerprint evidence destroyed or lost in *Roybal*, *DePriest*, and *Medina*, any prints removed from the handgun "may or may not have been defendant's and may or may not have been the perpetrator's." (*Roybal*, *supra*, 19 Cal.4th at p. 510.) This is thus a case in which "no more can be said" than that the handgun "could have been subjected to tests, the results of which might have exonerated the defendant." (*Youngblood*, *supra*, 488 U.S. at p. 57.)

To establish a due process violation, defendant therefore must prove that the police acted in bad faith. (*Youngblood*, *supra*, 488 U.S. at p. 57; *Duff*, *supra*, 58 Cal.4th at p. 549.) Defendant's primary argument is that bad faith is shown by the detectives' failure to follow the procedures set forth in the Mutual Legal Assistance Treaty Between the United States and Mexico (Dec. 9, 1987, T.I.A.S. No. 91-503 (eff. May 3, 1991) (MLAT)).

The MLAT generally provides for mutual legal assistance between the United States and Mexico in criminal matters, including "the prevention, investigation and prosecution of crimes." (MLAT*, supra*, art. 1, par. 1.) It sets forth procedures by which either country can request assistance from the other, including requests to take testimony, provide "documents,

---

[4] Like the trial court, we assume without deciding that Cambreros wiped down the handgun, as Jackson testified. We also accept defendant's argument that Cambreros was acting as an agent of the San Bernardino Police Department when he wiped down the gun—a point the Attorney General has not contested. (See *Dyas v. Superior Court* (1974) 11 Cal.3d 628, 633, fn. 2 [exclusionary rule applies to a person acting "as an agent of the police or participat[ing] in a joint operation with law enforcement authorities"].)

records and evidence," execute searches and seizures, and "locat[e] or identify[] persons." (*Id.*, art. 1, par. 4, subds. (b), (g).) Although the MLAT provides formal mechanisms for requesting such assistance, it does not preempt nor otherwise impair other avenues for providing mutual assistance. (*Id.*, art. 15 ["The Parties may also provide assistance pursuant to any bilateral or multilateral arrangement, agreement, or practice which may be applicable"].) And it states expressly that it "is intended solely for mutual legal assistance between the [sovereign] Parties"— not for the vindication of private rights. (*Id.*, art. 1, par. 5; see also *U.S. v. Rommy* (2d Cir. 2007) 506 F.3d 108, 129 (*Rommy*) ["As the Supreme Court has long observed, absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed by the signatory sovereigns through diplomatic channels"].)

Although defendant does not argue that failure to follow the MLAT is in itself a basis for reversal, he does argue that the failure to follow the formal protocols of the MLAT is evidence of the detectives' bad faith. He points to case law outside our jurisdiction to argue violating formal procedures governing the preservation of evidence constitutes bad faith. (See *U.S. v. Montgomery* (D.Kan. 2009) 676 F.Supp.2d 1218; *State v. Durnwald* (Ohio Ct.App. 2005) 837 N.E.2d 1234; *U.S. v. Elliott* (E.D.Va. 1999) 83 F.Supp.2d 637 (*Elliott*).) In *Elliott*, the defendant argued the Drug Enforcement Administration (DEA) destroyed fingerprint evidence in bad faith when it failed to preserve glassware implicated in a drug crime after photographing the evidence and dusting it for prints. (*Id.* at p. 640.) The court agreed this destruction rose to the level of bad faith primarily because the DEA's actions violated the agency's procedures and regulations respecting the disposal of drugs. (*Id.*

at p. 647.) The court noted that, although the failure to follow standard procedures does not "*ipso facto* establish bad faith," it "is probative evidence of bad faith, particularly when the procedures are clear and unambiguous." (*Ibid.*) In *Montgomery*, DEA agents were again found to have acted in bad faith, this time for destroying marijuana plants without photographing them, in violation of clear DEA policies. (*Montgomery*, at pp. 1244–1245.) Lastly, in *Durnwald*, a state trooper was found to have acted in bad faith when he erased dashboard video footage of a field sobriety test in violation of Ohio State Highway Patrol regulations. (*Durnwald*, at p. 1242.)

Defendant compares the procedural violations in *Elliott*, *Montgomery*, and *Durnwald* to the San Bernardino detectives' failure to retrieve the firearm through the formal channels of the MLAT. But while it is true the detectives could have filed an official request for assistance through the treaty (MLAT, *supra*, art. 1, pars. 1, 4; *id.*, art. 4), compliance with its procedures was not mandatory, as it was in the cases on which defendant relies; the treaty does not establish the exclusive means for recovering evidence located in the other country (*id.*, art. 15). (See *Rommy*, *supra*, 506 F.3d at p. 129 [interpreting similar provisions in Treaty on Mutual Assistance in Criminal Matters between the United States and the Netherlands and noting that "the treaty has no application to evidence obtained outside the MLAT process"].) Thus, in contrast to *Elliott*, *Montgomery*, and *Durnwald*, defendant cannot identify any violation of "clear and unambiguous" procedures based on the detectives' failure to request assistance through the treaty. (*Elliott*, *supra*, 83 F.Supp.2d at p. 647.)

Defendant also contends Cambreros demonstrated the requisite bad faith by intentionally wiping down the handgun.

31

But by defendant's own account, Cambreros wiped down the handgun only to avoid the possibility of being subpoenaed in the United States. Cambreros had no apparent reason to believe that by doing so, he was destroying any potentially exculpatory evidence, and defendant does not claim otherwise. (See *People v. Webb* (1993) 6 Cal.4th 494, 519 [due process rule is "intended to deter the police from purposefully denying an accused the benefit of evidence that is . . . known to be exculpatory"].) Cambreros's action may have been negligent, but negligence does not establish constitutional bad faith. (*U.S. v. Flyer* (9th Cir. 2011) 633 F.3d 911, 916 ["Bad faith requires more than mere negligence or recklessness"]; e.g., *Youngblood, supra,* 488 U.S. at p. 58 [failure to preserve clothing with semen samples was "at worst . . . negligent" and did not evince bad faith]; *Webb,* at p. 520 [no bad faith where law enforcement negligently left possible murder weapon in apartment after finding it during a search].) While Cambreros should not have wiped down the gun, defendant has not shown that Cambreros's action amounted to a violation of due process. Because defendant has not carried this burden, we uphold the trial court's denial of his motion to dismiss or suppress.

Finally, defendant argues in passing that the trial court should have at least given an adverse inference jury instruction regarding the government's destruction of evidence. We have held that such an instruction "need not be given where . . . no bad faith failure to preserve the evidence was shown." (*People v. Cook* (2007) 40 Cal.4th 1334, 1351.) We therefore reject this argument as well.

## B. Admission of Gang Expert Testimony

At trial, the prosecution offered testimony by Detective

Marty Penney, an expert in the culture, structure, and practices of criminal gangs in the El Monte area. He testified about the importance of gang recruitment, the significance of disrespect in gang culture, and the concept of "good murders." In addition to this general testimony, Penney offered opinions about potential gang-related motives for hypothetical killings that closely tracked the facts of this case. Defendant contends Penney's expert testimony was irrelevant (Evid. Code, § 1101), and unduly prejudicial (*id.*, § 352). He further argues that admission of the evidence violated his constitutional rights to due process and to reliable guilt and penalty verdicts. (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, § 15.) We review the trial court's admission of expert testimony for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 (*Prince*).)

The Attorney General contends defendant forfeited his argument by failing to object to the expert testimony on precisely the same grounds as he does now. We disagree. "In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented." (*People v. Scott* (1978) 21 Cal.3d 284, 290.) Here, before Penney testified, defendant filed a motion to exclude or limit gang-related testimony, arguing it was irrelevant, unduly prejudicial, and speculative. In expressing its intention to deny the motion, the trial court acknowledged the defense's objection "to the entire information about the defendant's involvement with the gang and the theory that goes to the prosecution in terms of motive and intent . . . ." Later, when Penney took the stand, defense counsel again objected to answers that called for speculation or were beyond the subject matter of Penney's expertise, including answers

related to the perpetrator's possible motives. This was adequate to preserve defendant's challenge to Penney's testimony. We will therefore address the challenge on the merits.

California law authorizes qualified experts to offer opinion testimony if the subject matter is "sufficiently beyond common experience" such that the expert's opinion "would assist the trier of fact." (Evid. Code, § 801, subd. (a).) In general, " '[t]he subject matter of the culture and habits of criminal street gangs . . . meets this criterion.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) When relevant to prove motive or identity, gang evidence is admissible "so long as its probative value is not outweighed by its prejudicial effect." (*People v. Williams* (1997) 16 Cal.4th 153, 193; see, e.g., *People v. Ward* (2005) 36 Cal.4th 186, 210 [allowing expert opinion explaining why the defendant may have entered rival gang territory and the defendant's "likely reaction to language or actions he perceived as gang challenges"]; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413 [allowing expert testimony about "the concept of payback within gang culture," where the defendant had previously been assaulted by rival gang members and several witnesses testified that the defendant made a gang-related comment before he shot the victim].)

An expert opinion may be rendered in the form of responses to hypothetical questions that ask the expert to assume the truth of certain facts rooted in the evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 1008; accord, *People v. Moore* (2011) 51 Cal.4th 386, 405 (*Moore*); *Vang*, *supra*, 52 Cal.4th at p. 1046.) But "the expert's opinion may not be based 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors.' " (*Richardson*, at p. 1008; accord, *Moore*, at p. 405; *Vang*, at p. 1046.)

Defendant argues the trial court erred by admitting Penney's testimony on possible gang-related motives for the three homicides because the testimony was not grounded in the evidence and did not rest on the witness's expert knowledge of gang culture, but rather on the witness's personal view of the evidence. We discern no prejudicial error in the admission of the challenged testimony.

In response to hypothetical questions, Penney opined it was possible Torres was killed because he had "some information" on defendant and because Torres showed disrespect by failing to "jump into the gang after giving his word that he would." Penney acknowledged, however, that he had never heard of anyone being killed for refusing to join a gang. Penney also surmised that Van Kleef was killed because he witnessed the Torres homicide and posed a threat to the perpetrator, especially since Van Kleef was not committed to the gang lifestyle and rules. As for the Ayala killing, Penney testified Ayala would have shown disrespect to defendant by declining to join the gang despite defendant's recruitment efforts, and that the manner of Ayala's death reflected an "assassinat[ion]" similar to the Van Kleef killing. Drawing on his knowledge of gang culture, Penney concluded the three hypothetical killings would have been considered so-called "good murders."

As an initial matter, the parties agree there was no evidentiary support for part of Penney's first opinion—that Torres could have been killed because he had "some information" on defendant. Defendant asserts, and the Attorney General does not dispute, that the reference to "some information" likely related to the prosecution's theory that defendant believed Torres knew about the killing of Mark

Jaimes and shot Torres to prevent him from disclosing what he knew about the connection between defendant and Jaimes. But the trial court had excluded evidence of the uncharged Jaimes killing from the guilt phase of trial. The Attorney General therefore concedes that Penney's reference to this possible motive was admitted in error.

We accept the Attorney General's concession but agree with the Attorney General that the error was harmless. Penney's reference to "some information" was ambiguous. Before the reference, the prosecutor had said: "There is some information that Alfred Flores is angry with Ricardo Torres about that particular issue, that he didn't show up to jump into the gang." Given that the prosecutor used the same phrase ("some information") to describe Torres's failure to jump into the gang, and given that neither the prosecutor nor Penney specified the nature of the "some information" Torres might have had on the person who shot him, it is unclear what significance the jury could have attributed to the reference. The colloquy contained no hint of any theory that defendant believed Torres knew information about a prior homicide. After the prosecutor asked if it was possible Torres was killed because he had "some information" on defendant, Penney responded with a simple "[y]es," and the prosecutor immediately pivoted back to the notion of disrespect and Torres's failure to jump into the gang.

Turning to the remainder of Penney's testimony, defendant contends Penney's opinions were inadmissible because there was no evidence that defendant personally asked the boys to join the gang or that criminal street gangs ordinarily kill people who refuse to join them.

Based on our review of the record, we conclude Penney's

36

testimony was sufficiently grounded in the evidence to both satisfy evidentiary standards and pass constitutional muster. Defendant's gang affiliation and philosophies were well established before Penney's testimony. Officer Loveless previously testified defendant admitted he was an active member of El Monte Trece and spoke about killing for a "righteous cause" as part of his philosophy of "street justice." Loveless specifically recalled defendant's statement that killing someone who demonstrated disrespect would be a "righteous cause according to gang culture." The prosecution also introduced evidence defendant was interested in expanding his gang's footprint by recruiting young men, specifically friends of Mosqueda.[5] Loveless recalled that during his interview of defendant, defendant explained he viewed himself as responsible for "school[ing]" Torres, Ayala, and Mosqueda in "the right way."

The prosecution also introduced evidence to support the hypothetical fact patterns it posed for each of the three killings. With respect to the Torres homicide, the prosecution elicited testimony from Mosqueda that Torres had backed out of his "jump[ing] in" ceremony and thereby declined to join defendant's gang. Although Mosqueda's testimony was inconsistent on this

---

[5] Much of the evidence regarding defendant's intent to expand the influence of El Monte Trece came from statements made by Mosqueda, whose testimony conflicted from one interview to the next. But there was additional supporting evidence, and the prosecution was not barred from offering hypothetical fact patterns based on some—but not all—of Mosqueda's conflicting statements. The ultimate resolution of disputed facts underlying the prosecution's hypothetical questions was a task assigned to the jury, which was properly instructed on its role.

matter, he stated before the jury that defendant was "disappointed" by Torres's failure to appear. Mosqueda also testified that immediately before Torres was shot, defendant said, "Hey, don't you trust me?" When combined with defendant's own statements about disrespect, "street justice," and "righteous" killings, the testimony about Torres's failure to join the gang and defendant's resulting disappointment, there is sufficient support for the hypothetical fact pattern presented to Detective Penney.

Defendant argues Penney's opinion on the hypothetical tracking the Torres killing was not based on Penney's specialized knowledge of gang culture because he admitted he had never before heard of someone being killed for failing to join a gang. But an expert need not have personal experience with the precise fact pattern to offer an informed opinion that is "sufficiently beyond common experience" so as to "assist the trier of fact." (Evid. Code, § 801, subd. (a); see also *id.*, subd. (b) [expert opinion may be based on matter "made known to him at or before the hearing," even if not "perceived by or personally known" to him].) Notably, Penney acknowledged the novelty of the hypothetical situation before the jury. And the jury was instructed it was not bound by the expert's opinion, but rather should give it the weight it deserved and decide independently whether the facts assumed in the hypothetical questions had been proved. (See *Vang, supra,* 52 Cal.4th at p. 1050 [noting jury's "critical role" in vetting expert's opinion in response to hypothetical questions]; *id.* at p. 1051 [noting that "the defendant has the opportunity during argument to stress to the jury that an expert's testimony is one opinion concerning the motivations of actors in a hypothetical scenario; the expert has no personal knowledge concerning the particular defendant's

state of mind"]; see also *Prince, supra*, 40 Cal.4th at p. 1227; *Moore, supra*, 51 Cal.4th at p. 406.) Because Penney's opinion drew on his expertise about the significance of gang recruitment, jumping-in ceremonies, and disrespect, we disagree with defendant's assertion that Penney offered a merely personal, rather than expert, view of the evidence.

Applying our deferential abuse of discretion standard (*Prince, supra*, 40 Cal.4th at p. 1222), we also find there was an adequate evidentiary basis for the hypothetical fact patterns relating to the Ayala and Van Kleef killings. With respect to Ayala, the prosecution asked Penney if Torres's killer would have wanted to kill Ayala because Ayala was not in the gang, was not loyal to the gang, and was close friends with Mosqueda. The hypothetical was adequately grounded in the evidence presented. Mosqueda testified that he and Ayala were close friends, that Ayala and defendant were not close friends, and that Mosqueda and Ayala had spent time together after Torres and Van Kleef were killed. Ayala was not in the gang, and Alvarez testified she had a conversation with defendant about trying to get "the boys" to join the gang, where she told defendant they were not gang types. The prosecution offered enough evidence that Ayala resisted efforts by defendant to recruit him into El Monte Trece to support its hypothetical questions to Penney.

With respect to Van Kleef, the prosecution presented a hypothetical in which Van Kleef witnessed Torres's murder, was not a gang member, and was shot in the back of the head. This hypothetical assumed facts fairly within the limits of the evidence. Jessica Ramirez, who was dating Ayala, testified she saw Van Kleef in Alvarez's van on the night of Torres's murder. Mosqueda similarly testified that Van Kleef was in the van that

night and that he and Van Kleef were outside the van when defendant shot Torres. Etnies-pattern shoe prints—the kind of shoes Van Kleef was wearing—were found at the Torres murder scene. Multiple witnesses acknowledged that Van Kleef was not in the gang. And the forensic pathologist who examined Van Kleef's body testified he was shot in the back of the head. It is true that the record did not include evidence drawing a line between Van Kleef as a potential witness to the crime and Flores therefore wanting him killed—which is to say, there are no statements by Flores expressing a desire to eliminate potential witnesses. We acknowledge the evidence of motive was not equally strong with respect to all three murders. But applying the usual standard of review, we conclude the trial court did not err by allowing the prosecution's hypotheticals.

The record not only provides adequate support for the hypotheticals, it also illustrates the trial court's care in exercising its discretion to exclude questions lacking evidentiary support. The court repeatedly struck Penney's testimony when it was not grounded in facts in evidence. (Cf. *Prince, supra*, 40 Cal.4th at p. 1222 [recognizing trial court's exclusion of improper expert testimony and careful attention to the issue].)

Defendant further argues that even if the expert testimony was relevant and supported by the evidence, the trial court should have excluded it as unduly prejudicial. (See Evid. Code, § 352.) Trial courts must "carefully scrutinize" gang-related testimony before admitting it into evidence, because the content of such testimony "may have a highly inflammatory impact on the jury." (*People v. Williams, supra*, 16 Cal.4th at p. 193.) The risk of injecting undue prejudice is particularly high in cases where the prosecution has not charged a gang enhancement and the probative value of the gang evidence is

minimal.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Here, the prosecution did not charge defendant with a gang enhancement, and the expert's testimony occasionally touched on inflammatory subjects; for example, Penney noted that the "ultimate" discipline for "rat[t]ing out another gang member" is death.  But any prejudice resulting from this testimony was far outweighed by its probative value.  Penney's testimony about gang culture—particularly the importance of recruitment, the significance of disrespect, and the concept of "good murders"—was highly relevant to defendant's possible motive for the charged crimes.  Moreover, the trial court properly exercised its discretion in limiting the scope of the expert's testimony to exclude any mention of specific crimes committed by other members of El Monte Trece.  The trial court did not abuse its discretion in admitting the expert's testimony.

## C.  Alleged Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct by misstating the evidence during her opening statement and eliciting inadmissible hearsay when questioning a witness, in violation of his rights to confrontation, due process, and a reliable guilt and penalty determination. (U.S. Const., 6th, 8th, & 14th Amends.; Cal. Const., art. I, § 15.)

Defendant asserts there were two instances of prosecutorial misconduct at the guilt phase.  First, he points to the prosecutor's remark during her opening statement that defendant admitted taking the nine-millimeter handgun to Mexico with him.  Because this statement was not borne out by the evidence at trial—witness testimony revealed that defendant admitted to taking a .22-caliber rifle to Mexico but not the nine-millimeter handgun—defendant claims the

prosecutor improperly attested to an otherwise unsupported material issue of fact. Second, defendant points to the prosecutor's questioning of Maria Jackson regarding the interaction Jackson had with her nephew, from whom she purchased the nine-millimeter handgun in Mexico. In response to one of the prosecutor's questions, Jackson relayed hearsay that her nephew recognized a picture of defendant as "the man that was here." Defendant argues the prosecutor deliberately solicited inadmissible hearsay to fill an evidentiary gap as to how the gun arrived in Mexico. Both these incidents, defendant claims, rendered the trial fundamentally unfair by introducing damaging evidence without affording him his right to confront the witnesses against him.

The United States Constitution requires reversal when a prosecutor makes improper remarks that " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright, supra*, 477 U.S. at p. 181.) " 'Conduct by a prosecutor that does not reach that level nevertheless [can] constitute[] misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 795.)

"A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) To preserve a claim of misconduct for appeal, a defendant must make a timely objection and ask the court to admonish the jury, unless an objection would have been futile and a request for admonition ineffective. (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)

Defendant has forfeited his challenge to the first of the claimed instances of prosecutorial misconduct. He acknowledges his failure to object to the prosecutor's remark during her opening statement and offers no persuasive reason to excuse this forfeiture. The remark was made at the very beginning of the trial, and there is no reason to suspect that corrective action would have been futile. (Cf. *People v. Friend* (2009) 47 Cal.4th 1, 29 (*Friend*) [failure to object excused "when the 'misconduct [is] pervasive, . . . and the courtroom atmosphere was so poisonous that further objections would have been futile' "]; *Hill, supra,* 17 Cal.4th at p. 822 [same].)

Defendant did successfully object to the prosecutor's questioning of Jackson, but he did not object on misconduct grounds or request a specific admonition to cure any harm.**[6]** Again, defendant fails to persuade that such a request would have been ineffective. (See *People v. Frye* (1998) 18 Cal.4th 894, 969.) He insists the harm of Jackson's testimony could not have been undone because without the hearsay statement, "there was no credible evidence to establish that [defendant] brought the gun to Mexico, or that he sold it to [Jackson's nephew] or anyone else." But this argument places too much weight on Jackson's testimony, which communicated only that her nephew said

---

**[6]** Several days after Jackson's testimony, defendant requested Jackson's answer be formally stricken from the record. The court erroneously believed it had ordered the comment stricken when it sustained defendant's objection in front of the jury, but the court nonetheless granted defendant's subsequent request to strike the testimony. Defendant never requested a specific admonition to the jury.

defendant "was here"—a fact supported by ample other evidence.[7]

In any event, regardless of whether defendant forfeited either or both asserted errors, the prosecutor's actions did not amount to prejudicial misconduct. " '[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 762 (*Dykes*).) During her opening statement, the prosecutor said defendant "admits to having the 9 mm. He also admits to taking down his rifle. That he had all of those. Went to Mexico with him." As explained below, the prosecutor's implied assertion—that defendant admitted to taking the nine-millimeter handgun to Mexico—was not directly supported by the evidence; the prosecutor's misstatement, however, does not amount to prosecutorial misconduct.

Although the prosecution did not produce direct evidence that defendant admitted taking the nine-millimeter handgun to Mexico, it did produce evidence of ambiguous admissions made by defendant with respect to the same gun. Most pointedly,

---

[7] This fact was supported by defendant's own statements to Detective Elvert that he had been in the same area of Mexico, that defendant had "torched" the van, and that he had removed the seats from the van beforehand. The jury easily could have inferred defendant had been at the same residence as Jackson's nephew: Elvert testified the area where the van was burned was "very close . . . [w]ithin a mile up the hill from the [nephew's] residence"; Acevedo testified he saw the van intact during his first trip to Mexico in that same neighborhood; and both detectives testified they recovered the van seats from the very residence where they met Jackson's nephew.

Loveless testified about an interview he conducted with defendant. During direct examination by the prosecutor, Loveless recalled defendant "admitted that the 9mm belonged to him" and defendant said, "Just because my fingerprints are on that gun, doesn't mean I killed anybody." In response to a clarifying question from the prosecutor, Loveless said "[t]hat was the gist" of the "discussion about the 9mm that was recovered in Mexico." Defendant did not object to this exchange.

On recross-examination, however, defense counsel asked Loveless about a report he wrote documenting the interview. After consulting the report and in response to questioning from the defense, Loveless confirmed defendant "admitted to transporting the .22-caliber rifle to Tijuana *but not the 9mm handgun.*" Loveless testified defendant's answers were at times "vague" and "evasive" during the interview; for instance, Loveless recalled defendant answering multiple questions with responses such as "[m]aybe so, maybe not" and "those theories [are] possibilities."

With the benefit of the complete record before us, we agree with defendant that the prosecutor mischaracterized defendant's admission regarding the transportation of the nine-millimeter handgun in her opening statement. But given the ambiguous nature of defendant's answers, which appeared to confuse even the detective conducting the interview, we cannot say the prosecutor's characterization of what she expected the evidence to show was wholly unsupported. (See *Dykes, supra,* 46 Cal.4th at p. 762.)

In any event, any mischaracterization by the prosecutor was not prejudicial. " '[P]rosecutorial misconduct in an opening statement is not grounds for reversal of the judgment on appeal

unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial.' " (*People v. Wrest* (1992) 3 Cal.4th 1088, 1109.)  The court twice instructed the jury that the attorneys' statements did not constitute evidence.  (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 ["We presume the jury followed the court's instruction"].)   And defendant had a full opportunity "to challenge and rebut all evidence offered against him."  (*Wrest*, at pp. 1109–1110; accord, *Dykes*, *supra*, 46 Cal.4th at p. 762.)  As noted above, during recross-examination, defense counsel elicited a clarification from Loveless that defendant "admitted to transporting the .22-caliber rifle to Tijuana but not the 9mm handgun."   Defense counsel reiterated this point in closing argument, underscoring the lack of direct evidence as to how the handgun arrived in Mexico.  In light of the court's cautionary instructions and defendant's challenge of the very evidence the prosecutor misstated, we discern no prejudice or denial of defendant's right to a fair trial.

The prosecutor's questioning of Jackson similarly does not constitute misconduct requiring reversal of the judgment. Defendant maintains the prosecutor deliberately elicited a hearsay statement made by Jackson's nephew, who was not available for cross-examination, thereby violating defendant's confrontation rights. (See *People v. Molano* (2019) 7 Cal.5th 620, 673–675 [prosecutor commits misconduct by deliberately drawing out inadmissible testimony]; *People v. Tulley* (2012) 54 Cal.4th 952, 1035 [same].)  Even if we were to assume that the prosecutor deliberately elicited Jackson's hearsay response, the misconduct was not prejudicial.   The trial court sustained defense counsel's objection to the prosecutor's question and Jackson's response; it later struck the question and response

from the record; and it twice instructed the jury not to consider any evidence that was rejected. (*People v. Martinez, supra*, 47 Cal.4th at p. 957.) It is true that this was a general instruction, not one that was directed specifically at Jackson's testimony. But if "defendant believed the jury should have been more directly admonished on this point, it was incumbent on him to request such an admonishment." (*Mills, supra*, 48 Cal.4th at p. 199.) As noted above, defendant did not do so.

Moreover, as explained above (see *ante*, fn. 7), defendant overstates the evidentiary value of the improper testimony. The jury heard other evidence indicating defendant had been at Jackson's nephew's residence, including defendant's own statements that he had been in that same area of Mexico and had burned the van, which was seen near the residence. Given this properly admitted evidence, and given the court's cautionary instructions, any prejudice from the prosecutor's question was minimal. (Cf. *Friend, supra*, 47 Cal.4th at p. 33 [prosecutor's eliciting of inadmissible hearsay was harmless in light of the defendant's admissions to the same effect].) The prosecutor did not, in short, commit prejudicial misconduct.

## D. Restrictions on Defendant's Cross-Examination of Polygraph Examiner

After his arrest, defendant agreed to take a polygraph examination. Both the fact of the examination and the results were excluded at trial (see Evid. Code, § 351.1, subd. (a) [prohibiting admission of references to polygraph exams and their results absent stipulation]), but defendant's otherwise admissible statements made during the examination were admitted (see *id.*, subd. (b)). Rather than introduce defendant's statements through audio or video recordings, which would have required redactions to eliminate any indicia of the polygraph

examination, the prosecution introduced defendant's statements through the testimony of the polygraph examiner, Robert Heard.

Defendant sought to exclude Heard's testimony about one particular exchange during the polygraph examination. Heard had asked if defendant was present when each victim was shot and had written down three options from which defendant could select: (A) "I shot 1, 2 or all 3," (B) "I was there (present) when 1, 2 or all 3 were shot," or (C) "I told someone to shoot 1, 2 or all 3." Defendant denied options A and C. Heard then asked defendant about specific victims. Defendant denied being present when Torres and Ayala were shot, but, according to Heard, defendant said, "I was present" when asked about the Van Kleef shooting. When Heard sought confirmation that defendant was present only when Van Kleef was shot, defendant refused to answer the question.

Defendant argued to the trial court that his answer to Heard's question about the Van Kleef shooting was inaudible and that the prosecution should not be allowed to introduce Heard's testimony about that particular answer. The trial court listened to the audio recording approximately 30 times and concluded defendant did, in fact, say, "I was present" in response to Heard's question. The court, therefore, allowed the prosecution to elicit Heard's testimony on the matter. The court also indicated that, depending on defendant's cross-examination of Heard, it might allow the prosecution to play the videotape of the interview so the jury could listen firsthand to defendant's response and observe his mannerisms and gestures. Although the court did not make a final determination about the admissibility of the videotape, it made clear that the prosecution could not introduce the video under any circumstances unless

the video was redacted to eliminate any indication that defendant was taking a polygraph examination.

At trial, Heard testified for the prosecution about the three options he presented to defendant and defendant's alleged admission to being present when Van Kleef was shot. Defense counsel cross-examined Heard about his exchange with defendant. The prosecution did not seek to introduce any part of the video, and the court never revisited the question of the video's admissibility. Defendant now challenges the trial court's earlier determination about the conditional admissibility of the videotape. He claims the trial court forced him to make a "Hobson's Choice" between his constitutional right to cross-examine Heard and his constitutional right to exclude evidence of the polygraph examination. We disagree.

In *People v. Westerfield* (2019) 6 Cal.5th 632, we rejected a similar claim. The prosecution in that case introduced a redacted videotape of the defendant's polygraph examination and called the polygraph examiner to testify about the defendant's responses. (*Id.* at p. 700.) On cross-examination, defense counsel asked the examiner about portions of the interview the court had previously ruled inadmissible and therefore had been redacted from the video. (*Id.* at p. 701.) The court warned defense counsel that further questioning on such subjects "would 'open the door' to the whole tape being admitted into evidence." (*Ibid.*) After multiple warnings, the court offered to allow defense counsel to ask questions regarding redacted portions of the video if coupled with a limiting instruction to the jury that certain material had been redacted from the videotape. (*Id.* at p. 702.) The defendant did not accept the court's offer. (*Ibid.*) On appeal, the defendant argued the court's conditional ruling left him with "no real choice but to

forgo further questioning." (*Id.* at p. 703.) We rejected the defendant's claim, noting, "[T]he trial court's ruling did not give the prosecution permission to introduce the entire tape containing the inadmissible polygraph evidence . . . ." (*Ibid.*)

Similarly here, defendant argues he was forced to sacrifice his right to cross-examine Heard to prevent the introduction of inadmissible polygraph evidence. But the trial court placed no limitations on defendant's cross-examination; the court simply indicated that certain questioning about the nature of defendant's statements might lead it to consider admitting a redacted portion of the videotape so the jury could evaluate the issue for itself. In light of the court's factual finding that defendant's answer to Heard's question was in fact audible, the court's tentative determination was reasonable.

Defendant also fails to persuade that introduction of the video would have violated his right to a fair trial. He insists the prosecution would not have been able to redact all indicia of the polygraph examination. But the court expressly conditioned any admission of the videotape on such removal, and defendant merely speculates that the court would have been unwilling or unable to uphold this condition. Indeed, defendant's own attorney had previously told the court that she "viewed the videotape and . . . can't tell really that that's a polygraph room." Absent any support for the contention that he was forced to sacrifice his right to confrontation to preserve his right to a fair trial, defendant's constitutional claims fail.

### E. Admission of Testimony That Defendant Was "Taken to the Polygraph Unit" and Trial Court's Curative Instruction

During cross-examination, defense counsel asked Loveless about the chronology of events at the end of his interview with defendant. Loveless testified that after he concluded the interview, defendant "was escorted over to the polygraph unit." The trial court immediately called for a recess to address Loveless's reference to "the polygraph unit." (See Evid. Code, § 351.1, subd. (a) [prohibiting the admission into evidence of "any reference to an offer to take, failure to take, or taking of a polygraph examination"].) At sidebar with counsel, the court expressed the opinion that Loveless did not intentionally exceed the bounds of admissible testimony, but the court did consider the reference "prejudicial" and noted, "[I]t doesn't take much to deduce that Mr. Heard is a polygraph examiner." Defendant moved to strike Heard's testimony and for a mistrial; the court denied both motions. The court decided to instruct the jury, at defense counsel's request, that defendant "was never offered nor ever submitted himself to a polygraph examination" but was "physically transported to that area [i.e., the polygraph unit] only because that's where Mr. Heard's office is."

On appeal, defendant claims Loveless's reference to "the polygraph unit" was prejudicial and the court's instruction failed to cure the resultant harm. He maintains the jury must have deduced Heard was a polygraph examiner because Heard, who testified immediately before Loveless, stated he was retired from the police force and agreed he now "assist[s] homicide detectives with interviewing particular witnesses." Defendant also asserts Heard's testimony reflected the kind of "yes or no" questions the jury would have associated with a polygraph

examination. Taking this evidence together, defendant contends the jury was likely to disbelieve the court's admonition and to discredit the defense as a result, thereby violating his rights to due process and to reliable guilt and penalty determinations. (U.S. Const., 8th & 14th Amends.)

We review the trial court's evidentiary ruling for abuse of discretion. (*Thompson*, *supra*, 1 Cal.5th at p. 1120 [applying abuse of discretion standard to "questions involving the admission of polygraph-related evidence"]; *People v. Jenkins* (2000) 22 Cal.4th 900, 986 [" '[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions' "].) Under this deferential standard, we discern no error.

As an initial matter, we note that the fleeting reference to "the polygraph unit" did not clearly constitute a "reference to an offer to take, failure to take, or taking of a polygraph examination" (Evid. Code, § 351.1, subd. (a)). While the jury could have inferred defendant took a polygraph examination when he was escorted to "the polygraph unit," that is not the only plausible inference; the trial court offered the jury another one—that Heard's office was located nearby. And the court's unequivocal statement that defendant "was never offered nor ever submitted himself to a polygraph examination" forcefully pointed the jury toward the latter inference. "In the context of erroneously offered polygraph evidence, we have held that a trial court's timely admonition, which the jury is presumed to have followed, cures prejudice resulting from the admission of such evidence." (*People v. Cox* (2003) 30 Cal.4th 916, 953 (*Cox*).) Assuming that the reference to "the polygraph unit" was

inadmissible, we have no reason to conclude the admonition was insufficient here.[8]

Nor are we persuaded by defendant's argument that the admonition was ineffective given the other evidence from which the jury may have deduced that Heard was a polygraph examiner. Heard testified he had worked in a number of law enforcement roles; he was then working as an investigator for the San Bernardino County Sheriff's Department and previously worked as an employee of the Los Angeles County Sheriff's Department and the Pomona Police Department. The fact that Heard said he now helped "homicide detectives with interviewing particular witnesses" did not meaningfully differentiate him from other law enforcement personnel, nor did it necessarily signal he was a polygraph examiner.

In sum, defendant fails to show that the trial court's immediate and forceful curative instruction—an instruction defendant himself suggested—was insufficient. (See *Thompson*, *supra*, 1 Cal.5th at p. 1122.) Defendant fails to establish a violation of his rights under either state or federal law.

---

[8] Defendant compares his case to *People v. Basuta* (2001) 94 Cal.App.4th 370, 389–391, where the prosecutor violated a preexisting court order not to mention a polygraph examination, which, when combined with another serious error, prejudiced the outcome of the trial. Defendant's argument is undeveloped and, in any event, fails for the same reasons that we rejected similar arguments in *Cox* and *Thompson*. (See *Cox*, *supra*, 30 Cal.4th at pp. 953–954 [noting that *Basuta* involved multiple evidentiary errors, including one more significant than the reference to polygraph-related evidence]; *Thompson*, *supra*, 1 Cal.5th at p. 1122 [noting that *Basuta* involved cumulative errors that " 'substantially affected the crucial issue in the case—[the main witness's] credibility' "].)

## F. Admission of Testimony That Victim Was Afraid of Defendant

Defendant argues the trial court erred by admitting certain testimony by Erick Tinoco, a friend of Torres, Van Kleef, and Ayala. According to Tinoco, Torres said he was concerned he might have been "in trouble" because he did not show up to his jumping-in ceremony, where he was supposed to join the gang. Torres also "said he didn't know if he should go back to Andrew's aunt's apartment because he was afraid that [defendant] was going to get mad at him, so he didn't know what to do." The court allowed this testimony to come in for the limited purpose of showing Torres's state of mind.

Evidence Code section 1250, subdivision (a)(1) provides that hearsay statements reflecting an existing state of mind of the speaker are admissible for the limited purpose of proving the declarant's state of mind. But this state of mind exception applies only if the declarant's state of mind is relevant to a disputed issue at trial. (*People v. Noguera* (1992) 4 Cal.4th 599, 621 (*Noguera*).) A trial court errs by admitting a murder victim's out-of-court statement of fear of the defendant when the victim's state of mind is not at issue. (*Ibid.*) "[A] victim's prior statements of fear are not admissible to prove *the defendant's* conduct or motive (state of mind). If the rule were otherwise, such statements of prior fear or friction could be routinely admitted to show that the defendant had a motive to injure or kill." (*People v. Ruiz* (1988) 44 Cal.3d 589, 609.) Here, Torres's state of mind was not at issue. It was error to admit his statements on this basis. (See *Noguera*, at pp. 621–622.)

We conclude, however, that the error in admitting the statements was harmless. It is not reasonably probable the jury would have reached a different result had it not heard evidence

that Torres was afraid defendant "was going to get mad at him." (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Torres's statements were relatively inconsequential compared to the other evidence adduced at trial. Multiple witnesses placed defendant at the scene of Torres's murder. Mosqueda testified that he saw defendant shoot Torres many times. And Alvarez testified that defendant was holding what appeared to be a pistol when he returned to her van immediately after the shooting. In addition, there was other, nonhearsay evidence to support the prosecution's theory of motive, including testimony that Torres did not attend his jumping-in ceremony and expert testimony that backing out of an agreement to join the gang would be considered disrespectful. The jury could have inferred defendant's motive from that evidence without Torres's hearsay statements expressing fear of defendant. We therefore conclude that any hearsay error in admitting Tinoco's testimony was harmless. (See *Noguera*, *supra*, 4 Cal.4th at pp. 622–623.)

## G. Sufficiency of the Evidence as to the First Degree Murders of Van Kleef and Ayala

Defendant argues there was insufficient evidence that he murdered Van Kleef and Ayala. We conclude there was sufficient evidence as to both murders.

The test for evaluating a sufficiency of evidence claim is deferential: "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) We must "view the evidence in the light most favorable to the People" and "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Ibid.*) We must also "accept logical inferences that the jury might have drawn

55

from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We begin with the evidence supporting defendant's conviction for the first degree murder of Van Kleef. Multiple witnesses testified that Van Kleef witnessed defendant murder Torres. Van Kleef was then himself murdered later that night. Defendant had no alibi and the jury could have logically concluded from the evidence that he was with Van Kleef at the time he was murdered. Alvarez testified she returned to her apartment after Torres was murdered to find defendant and Van Kleef there. Van Kleef then left the apartment, and defendant followed within a few minutes, holding the keys to Alvarez's van. Alvarez testified she was at that point worried about Van Kleef's safety. Defendant was gone for about an hour. When he returned to Alvarez's apartment, he told her "he had gotten into an argument or something and they broke the window, somebody broke the window" of her van on the front passenger's side. Alvarez said she went to her van and saw that half the passenger's side windshield had been shattered. Mosqueda testified he also saw the damage to the windshield. He described it as a "bullet hole."[9] From these facts, the jury could have inferred that defendant was with Van Kleef when he was killed; that defendant had shot someone near the van; and that the person defendant shot was Van Kleef. These inferences

---

[9] Defendant argues Mosqueda's testimony should be discredited because he changed his story over time. But "it is the exclusive province of the trial judge or jury to determine the credibility of a witness . . . ." (*People v. Jones, supra,* 51 Cal.3d at p. 314.) The jury was made aware of the discrepancies in Mosqueda's various accounts, and nonetheless presumably found his trial testimony to be credible.

would have been particularly reasonable given defendant's apparent motive to eliminate Van Kleef because he witnessed Torres's murder and was not loyal to the gang.

Significant physical evidence also linked the van, which was in defendant's possession at the relevant time, and defendant himself to Van Kleef's murder. Loveless, who investigated the Van Kleef crime scene, testified that Van Kleef's body was covered in a thin blue blanket or sheet, and Alvarez testified that she kept a blue sheet in her van. Loveless also testified that he found a white Stafford Polo-type T-shirt underneath Van Kleef's body. The prosecution introduced into evidence an open package of T-shirts of this type and brand that belonged to defendant. The forensic pathologist who examined Van Kleef testified he could have been shot by a nine-millimeter handgun, and defendant was known to carry a nine-millimeter handgun. Defendant himself also admitted he was "present" at the Van Kleef murder. Based on all this evidence, viewed in the light most favorable to the prosecution, a rational trier of fact could have found defendant guilty of murdering Van Kleef beyond a reasonable doubt.

We now turn to the evidence concerning Ayala's murder. The trial evidence showed that defendant again borrowed Alvarez's van during the time period when Ayala was murdered. On the night of the murder, Mosqueda drove Ayala home in Alvarez's van around 11:00 p.m. Mosqueda gave the keys to Alvarez, then returned to his home. Defendant then borrowed the van and left for approximately one hour. Ayala's sister testified about Ayala's whereabouts on the night he was killed. She was home that night around 10:30 p.m. or 11:00 p.m., and Ayala was there with her. Ayala told her he was not going out that night and was in the clothes he usually wore to bed. Ayala

was killed around midnight and left on the side of the road, in clothes inadequate for the weather. Detective Joe Palomino testified he clocked the mileage between the place where Torres was killed and the place where Ayala was killed the next day, and it was only two-tenths of a mile. Based on this evidence, the jury could logically infer that Flores killed Ayala during the time period when he borrowed Alvarez's van.

Furthermore, a rational jury could have logically concluded that the ballistics evidence—together with the other evidence presented—showed defendant murdered Ayala. Two bullets were recovered from the Ayala crime scene. Heward testified that she test-fired the nine-millimeter handgun recovered from Mexico and compared the test-fires to the two bullets found at the Ayala crime scene. She was able to identify one of the bullets as coming from the handgun but was not positive about the other bullet. This was the same nine-millimeter handgun that she identified was used in the Torres murder. The handgun was linked to defendant in that he was known to carry a nine-millimeter handgun; Mosqueda identified the nine-millimeter handgun from Mexico as the one defendant carried; and multiple witnesses testified that defendant appeared to have shot Torres. The jury could have logically inferred that defendant shot Torres and Ayala with the same handgun.

We agree with defendant that there was limited evidence of defendant's motive for killing Ayala. The jury heard testimony that Ayala was friends with Van Kleef and Mosqueda, both of whom had witnessed the Torres killing; indeed, Mosqueda testified he saw Ayala every day. The jury also heard evidence that defendant was a member of the El Monte Trece gang and that, according to Detective Penney, in the gang

culture, "disrespect" would be a reason to murder someone. Ayala was not in the gang; Penney testified that declining to join the gang, as Ayala did, would have been considered a form of disrespect. Penney also testified that, because Ayala was shot in the back of the head while on his knees, he appears to have been assassinated, just like Van Kleef. Based on this evidence, the jury may have inferred that defendant believed Van Kleef or Mosqueda had told Ayala about the Torres murder and that defendant killed Ayala for much the same reason he killed Van Kleef—that is, to silence all potential witnesses to the Torres murder not affiliated with the gang. Alternatively, the jury could have believed defendant felt it was disrespectful for Ayala to decline to join the gang and murdered him for that reason. But in any event, motive is not an element of murder, so the prosecution could prove its case without definitive evidence of a motive. The relatively limited evidence of motive does not undermine the sufficiency of the evidence that defendant committed the crime.

Defendant compares his case to *People v. Blakeslee* (1969) 2 Cal.App.3d 831. There, the Court of Appeal found insufficient evidence where the defendant could be placed at the murder scene but where there was little else to connect her to the murder. (*Id.* at pp. 837–840 [highlighting, in particular, the absence of a murder weapon or any evidence "linking the defendant in some manner to a weapon" (*id.* at p. 840)].) The comparison is inapt. Here, unlike in *Blakeslee*, the prosecution presented evidence linking defendant to the type of weapon used in the murders. There was also other physical evidence linking defendant to the Van Kleef murder, including the T-shirt, the blue sheet, and the bullet hole in the van window. Finally, defendant does not dispute the sufficiency of the evidence that

he murdered Torres. The close proximity in time and space of the other two murders, and the fact that all three boys were in the same friend group, also supported an inference that the murders were related to one another. Based on these facts and all the evidence in the record, we conclude there was sufficient evidence showing defendant murdered Van Kleef and Ayala.

## IV. PENALTY PHASE ISSUES

### A. Purported *Miranda* Violation Regarding Admission of Guilt for Jaimes Murder

#### 1. Background

During the penalty phase of trial, the prosecution introduced a taped interview during which defendant confessed to killing Jaimes.[10] Defendant admitted he killed Jaimes after Jaimes allegedly disrespected defendant and his mother; Jaimes had solicited defendant's mother as a prostitute and then refused to promptly leave the motel where defendant and his mother were living. After a verbal altercation between the two men, defendant killed Jaimes by shooting him multiple times in the stomach, chest, and head. Defendant recalled wrapping Jaimes's body in plastic, placing it in the trunk of a car he stole, and then taking the car for a joyride before parking it near the motel. Jaimes's body was later discovered by Milam, the owner of the car, who recovered it from an impound lot.

The Jaimes killing occurred in Los Angeles. Los Angeles authorities did not locate defendant until Customs and Border Patrol caught him attempting to cross the United States-Mexico

---

[10] As noted above, the court did not allow the prosecution to introduce evidence of this uncharged homicide during the guilt phase of trial, deeming it unduly prejudicial.

border on September 6, 2001. The San Bernardino authorities, who were actively investigating the three homicides in the present case, transported defendant from the border to their jurisdiction and informed the Los Angeles Police Department defendant was in their custody. Defendant was booked that evening. At approximately 10:55 p.m., Detective Chris Elvert of the San Bernardino County Sheriff's Department interviewed defendant about the Torres, Van Kleef, and Ayala homicides.[11] Elvert advised defendant of his *Miranda* rights at the start of the interview, and defendant indicated that he understood his rights and was willing to speak with the detective. Elvert continued to question defendant for approximately one hour. Defendant answered many of Elvert's questions but refused to answer others; throughout the interview, defendant denied responsibility for the crimes.

The following morning, Elvert walked defendant across the street to a nearby facility where Lieutenant Kusch of the Los Angeles Police Department was waiting. Elvert told Kusch defendant had been advised of his *Miranda* rights the previous night and had participated in a lengthy interview. Kusch introduced himself to defendant and explained that he planned to ask defendant about a different crime—the Jaimes killing. He told defendant Los Angeles County did not have an arrest warrant out for him at that time. Kusch also noted that defendant may have already known quite a bit about their

---

[11] Elvert had driven defendant from the border to San Bernardino and had spoken with defendant during the drive without giving any *Miranda* advisements. The prosecution did not introduce any evidence related to the drive, and defendant does not rely on the lack of *Miranda* advisements during the drive to support his arguments here.

investigation through his mother or other family. Before Kusch began any substantive questioning, he readvised defendant of his *Miranda* rights, and defendant indicated that he understood all of them. Kusch then said: "Basically what I'd like to do is talk about the the [*sic*] case that we investigated that we got called out on back on November 17th, 2000. Uh I'll tell you how we got called out on it in a minute but uh do you want to take a few minutes to talk a little bit about that?" The transcript records defendant's response as "No," although in the videotape of the interview, the response sounds more like, "Nah." Kusch responded as follows:

"Well essentially what I want to do is to take a minute and kind of explain to you what uh what we got called out on and what the investigation entailed and what not. Of course you know whether you choose to answer the questions is completely up to you um but obviously you know I just wanted to at least give you the thumbnail sketch of what we investigated, what we what we [*sic*] did and talk a little bit about that. Again, you know you don't have to answer any questions. We're just sitting here, if you don't want to answer certain questions you don't have to answer them, if you want to answer other questions you can answer those. So, you know . . . for example some of the stuff I want to talk to you about is what's your name and birth date and stuff like that which are pretty simple questions. So. Do you want to take a few minutes and talk to me about that stuff?"

Defendant answered: "Oh yeah, well whatever." The interview continued from there, and eventually defendant described in detail how he killed Jaimes. Defendant told Kusch: "I'm gonna tell you what happened. [¶] . . . [¶] Not because I have to not because, I mean because I want to, ay. Cuz I feel

what happened wasn't right." Defendant said he went to the motel room where his mother lived to find Jaimes there, seemingly taking drugs; defendant asked him to leave, but he would not leave and was "disrespecting" and "coming at my mom." Defendant told Kusch: "I murdered him ey. I did it. All right? And I enjoyed doing it ay. I'm gonna tell you why, because it was defending my mother." Defendant later said, "I pulled out my gun and I blew his fucking head off ay."

Before trial, defendant filed a motion to suppress his statements to Kusch, claiming he invoked his right to remain silent by saying, "No" when asked whether he wanted "to talk a little bit about that." The trial court held an evidentiary hearing and reviewed audio recordings and transcripts of the aforementioned interviews. The court ruled that defendant's "[n]o," in context, was not an unambiguous invocation of his right to remain silent. In the court's view, defendant's answer was ambiguous because Kusch's question was ambiguous: when Kusch asked defendant whether he wanted to talk "*about that*" (italics added), it was unclear whether Kusch was referring to the Jaimes case in general or to the specific matter of how the Los Angeles Police Department "got called out on" it. In light of this ambiguity, the court reasoned, Kusch properly clarified defendant's right to refuse to answer questions, and defendant thereafter waived his *Miranda* rights by willingly engaging in the interview.

Defendant now challenges the trial court's admissibility ruling. He claims the statements he made to Kusch were obtained in violation of *Miranda* and that their introduction during the penalty phase of trial violated his rights to due process, to a reliable penalty verdict, and to be free from cruel and unusual punishment. (U.S. Const., 5th, 8th & 14th

Amends.; Cal. Const., art. I, § 15.) We conclude the trial court did not err in ruling defendant's statements admissible.

### 2. *Analysis*

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.) To protect suspects' Fifth and Sixth Amendment rights, in *Miranda v. Arizona* (1966) 384 U.S. 436, the high court held that before questioning, individuals in custody must be advised of their right to remain silent, that anything they say may be used as evidence against them, and that they have the right to the presence of an attorney, whether retained or appointed. (*Id.* at p. 444.) But a suspect can waive these rights and agree to speak with law enforcement. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 104.) The burden is on the prosecution to prove by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary, based on a totality of the circumstances. (*Ibid.*)

The requirements for a valid waiver of rights differ from the requirements for a valid invocation of rights. (*Smith v. Illinois* (1984) 469 U.S. 91, 98 (*Smith*) ["Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together"].) "A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision." (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).) "A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*Ibid.*) The critical question with respect to waiver is whether it was knowing and voluntary,

which is "directed at an evaluation of the defendant's state of mind." (*People v. Williams* (2010) 49 Cal.4th 405, 428 (*Williams*).)

In contrast, a suspect's *invocation* of *Miranda* rights must be "unambiguous[]" from the perspective of a reasonable officer. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381 (*Berghuis*).) If "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right," then the officer need not cease all questioning immediately. (*Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).) Whether or not a reasonable officer would perceive a suspect's statement as ambiguous may depend on context. (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218 (*Sauceda-Contreras*); *Williams, supra,* 49 Cal.4th at pp. 428–429; *People v. Sanchez* (2019) 7 Cal.5th 14, 49–50.) " '[W]hen a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, "the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights." ' " (*Williams*, at p. 428.)

"In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

### a. Invocation of the Right To Remain Silent

Defendant advances a series of layered arguments challenging the admission of his confession to the Jaimes

murder. First, he contends he unambiguously invoked his right to remain silent when he answered, "No" in response to Kusch's initial query whether defendant "wanted to talk a little bit about that." Defendant argues that, at that point, Kusch should have immediately terminated the encounter. Instead, as noted above, Kusch asked a follow-up question to clarify the nature of his inquiry, repeatedly reminding defendant of his right not to answer questions. In response to this follow-up, defendant expressed willingness to answer Kusch's questions. Defendant argues there never should have been a follow-up question, so his expressed agreement to continue the interview should be given no effect. After closely reviewing the record, including a videotape of the interview, we are not persuaded.[12]

It is true, as defendant emphasizes, that a "no" response to a simple question whether the suspect wishes to speak with law enforcement generally constitutes an unambiguous invocation. (See, e.g., *People v. Case* (2018) 5 Cal.5th 1, 21 ["In this case, defendant was asked whether he would talk to the detectives and answered no. This seems clear enough"]; *Garcia v. Long* (9th Cir. 2015) 808 F.3d 771, 773 [similar].) But here, considered in context, neither the question asked, nor the answer given was this simple—and, as is true with most questions of interpretation, context does matter. In certain

---

[12] To avoid any confusion, we emphasize that the question before us is not whether Kusch was entitled to refuse to "take 'no' for an answer" and simply forge ahead with his substantive questioning. (Conc. & dis. opn., *post*, at p. 9.) That is not the situation we confront here, and we do not address it. The only question is whether it was permissible for Kusch to ask his follow-up clarifying question, to which defendant responded with willingness to continue the interview.

situations, statements that might seem clear in isolation "actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the defendant." (*Williams*, *supra*, 49 Cal.4th at p. 429; see also, e.g., *People v. McGreen* (1980) 107 Cal.App.3d 504, 522 [head shake, followed by verbalized "no," unclear in context; permissible for officer to clarify suspect's meaning]; *Medina v. Singletary* (11th Cir. 1995) 59 F.3d 1095, 1105 [defendant's "no" unclear in context; under circumstances, "[t]o prohibit a clarifying question . . . would 'transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity' "].)

Several circumstances, taken together, lead us to conclude that this is a case in which the officer acted reasonably in clarifying defendant's intent. First, the clarity of a suspect's answer may depend in part on the clarity of the officer's question. (*Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 219; cf. *Smith*, *supra*, 469 U.S. at p. 98 ["*Where nothing about the request . . .* or the circumstances leading up to the request *would render it ambiguous*, all questioning must cease" (italics added)].) Here, as the trial court found, the nature of Kusch's initial question was unclear. Kusch said he would "tell [defendant] how [the police] got called out on [the case] in a minute" immediately before asking whether defendant "want[ed] to take a few minutes to talk a little bit *about that*." (Italics added.) It was not entirely clear whether Kusch was asking defendant whether he was willing to answer questions

about the Jaimes case or whether defendant wanted to talk about how "we got called out on it," or both. Because Kusch's question was imprecise, defendant's answer could have meant either, "No, I do not want to talk to you at all," or "No, I do not want to hear about how the police got called out."[13]

The factual backdrop to the conversation makes the second interpretation particularly plausible. Although a suspect normally might not care much about how a law enforcement agency began its investigation, in this case there was cause to think defendant might react differently. That is because defendant's own mother played a central role in that story by providing information that helped lead the police to

---

[13] The dissent disagrees with this assessment, concluding that the "plain language and flow of Kusch's prefatory statements . . . leave no doubt" about the intended referent of the "that." (Conc. & dis. opn., *post*, at p. 6.) We do not disagree that the dissent has the better reading of Kusch's intended meaning—indeed, Kusch would make this intent clear in his follow-up question. But was this the only way defendant could have understood Kusch's imprecise initial question? We agree with the trial court that it was not.

The dissent also argues that the form of Kusch's question "invit[ed] Flores to speak," not the other way around, because Kusch asked if defendant "wanted to '*talk* a little bit about that.'" (Conc. & dis. opn., *post*, at p. 6, italics added.) But in ordinary speech, we understand that asking another person if he or she is willing to talk about something often means the speaker has something to say (consider, for example, the age-old "We need to talk"). Here, Kusch's question contained a promise to talk to defendant about a subject of which defendant had no personal knowledge—the path of the police investigation of the Jaimes murder. It is not unreasonable to think defendant was focused on that promise when he answered Kusch's question.

defendant, as Kusch himself would explain to the jury during the penalty phase of trial. Kusch had reason to believe defendant was aware of that fact and indeed alluded to it shortly before asking if defendant wanted to talk: "Um pretty clearly you know we've done a pretty thorough investigation," Kusch said, "I don't know if you had a chance to talk to any family or your mom or anything between you know November and now but uh I have a sense that you probably know a little bit about uh our investigation et cetera." As Kusch was aware, how the police "got called out on" the case may have been a subject of particular personal importance to defendant. Knowing that, a reasonable officer might well wonder whether defendant's response to Kusch's poorly framed question was aimed at Kusch's promise to talk more about the path of the police investigation, as opposed to signaling unwillingness to answer Kusch's questions about the Jaimes murder.

The videotape of the interview, which we have reviewed, also provides context to our inquiry and reinforces our conclusion about the lack of clarity in the initial exchange between Kusch and defendant. The interview begins with Kusch and defendant in the interrogation room, with defendant sitting calmly and Kusch audibly fumbling with his papers. Kusch then begins a lengthy, somewhat unfocused discussion of the various things Kusch plans to disclose to defendant and what he is generally interested in learning from defendant. Kusch then begins to read defendant his *Miranda* rights. Defendant smiles and nods in response. When Kusch ultimately asks whether defendant wants to "take a few minutes to talk a little bit about that" defendant says a casual sounding "no," or, perhaps, "nah"; as he says this, defendant is still smiling and gives a short laugh. The dissonance between defendant's

seemingly bemused demeanor and his spoken response is confusing; the combined effect is murky and unclear. A reasonable officer, having just asked a badly framed question, might legitimately wonder whether this response was rooted in some misunderstanding of the officer's intended meaning. (Compare, e.g., *Com. v. Mazariego* (2016) 474 Mass. 42, 53 [47 N.E.3d 420, 430] [relying on the defendant's laughter, as shown on the videotape of his interview, to help explain that when he said, " 'No, no, no,' " he was responding to a different proposition, not to the question whether he wanted to continue talking].)

Finally, we note that at the time of this exchange, Kusch knew that defendant had, the previous day, already waived his *Miranda* rights and voluntarily engaged in an extended conversation with Detective Elvert about the homicides charged in this case. At least until this point, nothing in defendant's interactions with Kusch suggested that defendant would be less willing to answer questions about the Jaimes homicide. Defendant was of course entitled to refuse to answer questions about the Jaimes homicide, as Kusch properly informed defendant, and defendant's willingness to talk about the homicides charged in this case creates no presumption that he would also be willing to talk about a different homicide. But this, too, may add context to Kusch's decision to ask a question clarifying his initial, poorly framed inquiry into defendant's willingness to answer questions about the Jaimes murder.

Based on all of these case-specific contextual considerations, we agree with the trial court that Kusch was not bound to cut off the encounter immediately; it was not unreasonable for Kusch to ask a neutral follow-up question to clarify defendant's intent.

This conclusion is consistent with our precedent in this well-trodden area of the law. (See *Sauceda-Contreras*, *supra*, 55 Cal.4th 203; *Williams*, *supra*, 49 Cal.4th 405.)[14] In *Williams*, the defendant, then a suspect in custody, expressed a willingness to waive his right to remain silent. (*Id.* at p. 426.) The interrogating officers then inquired about defendant's willingness to waive the right to counsel, and the following colloquy took place:

> "[Defendant]: 'You talking about now?'
>
> "[First Officer]: 'Do you want an attorney here while you talk to us?'
>
> "[Defendant]: 'Yeah.'
>
> "[First Officer]: 'Yes you do.'
>
> "[Defendant]: 'Uh huh.'
>
> "[First Officer]: 'Are you sure?'
>
> "[Defendant]: 'Yes.'
>
> "[Second Officer]: 'You don't want to talk to us right now.'
>
> "[Defendant]: 'Yeah, I'll talk to you right now.'
>
> "[First Officer]: 'Without an attorney.'
>
> "[Defendant]: 'Yeah.' "

---

[14] *Williams* and *Sauceda-Contreras* involved purported invocations of the right to counsel rather than the right to remain silent, but we apply the same analysis to both inquiries. (See *Berghuis*, *supra*, 560 U.S. at p. 381 ["there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"].)

(*Ibid.*)  The officers went on to explain that if the defendant wanted a lawyer, a public defender would be present in a couple days, but the defendant insisted he did not want to wait and preferred to talk with the officers immediately.  (*Ibid.*)

On appeal, the defendant argued the officers were required to cease all questioning as soon as he said, " 'Yeah' " in response to their question whether he wanted an attorney.  (*Williams*, *supra*, 49 Cal.4th at p. 426.)  In response, we explained that while the defendant's " 'Yeah' " may have seemed clear in isolation, the answer was ambiguous in context.  (*Id.* at pp. 429–431.)  The defendant had previously waived his right to remain silent and appeared confused about the timing of when an attorney would be available; under those circumstances, the officers were permitted to ask follow-up questions to clarify what he truly intended.  (*Id.* at p. 429.)

In *Sauceda-Contreras*, *supra*, 55 Cal.4th 203, a detective similarly advised the defendant of his *Miranda* rights with the help of a translating officer, and the defendant said he understood.  (*Id.* at p. 206.)  He was then asked:  " 'Having in mind these rights . . . , the detective would like to know if he can speak with you right now.' "  (*Ibid.*)  The defendant responded:  " 'If you can bring me a lawyer, that way I[,] I with who . . . that way I can tell you everything that I know and everything that I need to tell you and someone to represent me.' "  (*Ibid.*)  The translator said, " '[P]erhaps you didn't understand your rights,' " and rephrased the question:  " '[W]hat the detective wants to know right now is if you're willing to speak to him right now without a lawyer present?' "  (*Ibid.*)  The defendant responded affirmatively.  The detective, through the translator, reiterated that "[t]he decision is yours" and repeated the question.  (*Ibid.*)  After the defendant repeatedly expressed a desire to continue

without an attorney, the detective conducted an interrogation and ultimately obtained a confession. (*Ibid.*)

We rejected the defendant's argument that the officers were required to cease all questioning after his initial response referred to " 'bring[ing him] a lawyer.' " (*Sauceda-Contreras, supra*, 55 Cal.4th at p. 206.) We explained that his answer was "conditional, ambiguous, and equivocal," in part because of the question asked of him. (*Id.* at p. 219.) Because the question was qualified with " 'right now,' " the defendant's answer was "impliedly asking whether [an attorney] could be provided *right now*." (*Ibid.*) We concluded that "[f]rom an objective standpoint, a reasonable officer under the circumstances would not have understood defendant's response to be a clear and unequivocal request for counsel." (*Ibid.*) It was therefore appropriate for the detective to "seek[] confirmation that [the defendant] understood the decision to proceed with the interview . . . was his alone, and that he in fact wished to do so." (*Id.* at p. 220.)

Much as in *Williams* and *Sauceda-Contreras*, we conclude that defendant's "[n]o," in context, was susceptible of more than one possible interpretation. Kusch therefore was not forbidden from asking his follow-up question to clarify defendant's intent. We emphasize, as we did in these prior cases, that Kusch's question was both brief and neutrally phrased and delivered; Kusch did not in any way badger defendant nor otherwise use coercive tactics to induce a waiver of his right to remain silent. (See *Sauceda-Contreras, supra*, 55 Cal.4th at p. 220 ["No coercive tactics were employed in order to obtain defendant's waiver of his rights"]; *Williams, supra*, 49 Cal.4th at p. 429 ["it does not appear that the officers were 'badgering' defendant into waiving his rights"].) On the contrary, in clarifying whether defendant was willing to answer questions, Kusch reminded

defendant—no fewer than three times—that he was under no obligation to do so.

The dissent does not appear to take issue with the basic lesson of these cases: That, in some instances, context may raise questions about the meaning of a seemingly unequivocal response. Nor does the dissent dispute that, "[i]n those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions" to clarify. (*Williams*, *supra*, 49 Cal.4th at p. 429.) The dissent argues, however, that Kusch's effort to clarify here was impermissible because defendant's response was meaningfully less ambiguous, in context, than were the responses of the defendants in *Sauceda-Contreras* or *Williams*.

Our prior cases are not easily distinguished on the grounds cited by the dissent. The dissent claims that *Sauceda-Contreras* differs from this case because the defendant's invocation there was ambiguous "based on a number of facts, not just the nature of the detective's question." (Conc. & dis. opn., *post*, at p. 10.) But surely the nature of the question matters in evaluating the meaning of the answer. And in any event, we have explained that, here, too, the available facts support the conclusion that defendant's "[n]o" answer in response to Kusch's poorly framed question may have rested on a misunderstanding of Kusch's intended meaning.

The dissent would distinguish *Williams* on the ground that the defendant there asked a question about timing (" 'You talking about now?' ") before responding " 'Yeah' " to the question " 'Do you want an attorney here while you talk to us?' " (*Williams*, *supra*, 49 Cal.4th at p. 426.) Here, by contrast,

defendant did not ask Kusch questions when asked whether he wanted to "talk a little bit about that." (Conc. & dis. opn., *post*, at p. 12.) But it is not clear why this distinction matters. In *Williams*, the interrogating officer's question was clear, while here it was not. Nonetheless, despite the defendant's seemingly absolute response to the officer's question in *Williams*, we concluded there was "sufficient ambiguity" in the exchange "that a reasonable officer would be uncertain of defendant's actual intent," and that it was therefore reasonable to clarify. (*Williams*, *supra*, 49 Cal.4th at p. 431; see *id.* at p. 430.) The same is true here.

The dissent relies heavily on *Anderson v. Terhune* (9th Cir. 2008) 516 F.3d 781, but that case differs markedly from this one. There the court found it unambiguous when the defendant said, " 'I plead the Fifth,' " and concluded the interrogating officer did not ask a "legitimate clarifying question" when he responded, " 'Plead the Fifth. What's that?' " (*Id.* at pp. 784, 787–790.) But unlike defendant's simple "[n]o," " 'I plead the Fifth' " is a "pristine invocation of the Fifth Amendment" that does not vary its meaning based on the question asked. (*Id.* at p. 784.) And unlike the interrogating officer's feigned ignorance of the Fifth Amendment in *Anderson*, Kusch did ask a follow-up question legitimately aimed at clarifying defendant's intent.

Finally, in arguing it was improper for Kusch to ask his neutral follow-up question, defendant and the dissent rely on the testimony of Sergeant Robert Dean, who monitored Kusch's interrogation in real time and testified about it during the evidentiary hearing. When asked whether he "ever hear[d] Mr. Flores ask for an attorney, ask to remain silent, or any nonverbal behavior that would tell you he didn't want to talk to Lieutenant Kusch," Dean said, "At one point. [¶] . . . [¶]

Lieutenant Kusch asked Mr. Flores if he wanted to talk about that, *meaning the Maywood murder*, and Alfred replied, 'No.' " We do not find Dean's characterization to be particularly telling. Dean's testimony certainly provides one plausible interpretation of Kusch's question (and, by extension, of defendant's response). But as explained above, it is not the only plausible interpretation. Considering the exchange in its broader factual context, it was objectively reasonable for Kusch to ask his brief, neutrally worded follow-up question to ensure he understood what defendant meant. (See *Williams*, *supra*, 49 Cal.4th at p. 428 [the "question of ambiguity in an asserted invocation" is an "objective inquiry"].)

In sum, in light of the circumstances surrounding defendant's "[n]o" answer, we conclude a reasonable officer certainly could have understood that defendant *might* be invoking his right to remain silent but would not have understood whether he was *in fact* invoking his right to remain silent. (See *Davis*, *supra*, 512 U.S. at p. 459.) It was therefore reasonable to clarify. This conclusion is a narrow one, based on the particular circumstances surrounding the interrogation in this case. Although we ultimately agree with the trial court that defendant's initial "[n]o" answer was unclear because Kusch's initial question was imprecise, our conclusion is based on other contextual factors as well, including the background information known to Kusch and defendant's demeanor and vocal inflection as recorded in the videotaped interview. We do not hold that an officer may purposefully create ambiguity in a suspect's invocation of rights by asking an unclear question. Officers should do just the opposite. They should ask clear questions amenable to simple answers. But given the circumstances of the case, we conclude Kusch acted reasonably

in asking a neutral follow-up question to clarify whether defendant wished to answer questions, while repeatedly reminding defendant of his right to remain silent. (See *Williams*, *supra*, 49 Cal.4th at p. 428.)[15]

---

[15] This conclusion also disposes of defendant's alternative argument that even if his response was ambiguous, Kusch was obligated to stop and clarify whether defendant indeed intended to invoke his right to remain silent. For this argument, defendant relies on the Ninth Circuit's opinion in *U.S. v. Rodriguez* (9th Cir. 2008) 518 F.3d 1072, 1080, in which the court held that "[p]rior to obtaining an unambiguous and unequivocal waiver, a duty rests with the interrogating officer to clarify any ambiguity before beginning general interrogation." The court distinguished *Davis*, *supra*, 512 U.S. 452, 461–462, where the high court held that officers are permitted—but not required—to clarify ambiguous invocations that arise partway through lawful interrogations.

This court has previously acknowledged the Ninth Circuit's ruling in *Rodriguez* without expressly approving or rejecting it. (*Duff*, *supra*, 58 Cal.4th at p. 553 [noting that whereas "we have held that an officer is permitted to clarify the suspect's intentions and desire to waive his or her *Miranda* rights," the Ninth Circuit has held that "an officer not only may, but *must*, clarify the suspect's intentions"]; see *id.* at p. 554 [observing that "[w]e have occasionally implied the same rule as the Ninth Circuit's," citing *People v. Box* (2000) 23 Cal.4th 1153, 1194].) We do the same in this case: Even if Kusch was under a duty to stop and clarify defendant's intent following his ambiguous response to the *Miranda* warnings, Kusch did just that.

We likewise conclude that Kusch's follow-up question was adequate for this task. As we explained in *Duff*, an officer is "not under a legal obligation to follow any particular script in ascertaining [the defendant's] desires." (*Duff*, *supra*, 58 Cal.4th at p. 554.) Kusch explained that what he was asking was whether defendant was willing to answer questions and

### b. *Limited Waiver*

As noted above, when Kusch asked his follow-up question to clarify whether defendant was willing to answer questions, defendant this time responded affirmatively, if dispassionately: "Oh yeah, well whatever." Defendant argues that even if this was a valid waiver of the right to remain silent, it was a limited one: It extended only to background questions about his name and age. He emphasizes that Kusch said, "[S]ome of the stuff I want to talk to you about is what's your name and birth date and stuff like that." It was immediately after this description that Kusch asked: "Do you want to take a few minutes and talk to me about that stuff?" Defendant argues, in effect, that the scope of Kusch's question delimited the scope of his own answer, such that defendant's waiver extended only to basic personal information. We disagree.

A suspect may invoke his right to remain silent selectively. (*People v. Suff* (2014) 58 Cal.4th 1013, 1070.) For instance, in *People v. Johnson* (1993) 6 Cal.4th 1, we held that the defendant's remark that he did not want to be tape-recorded placed a " 'partial restriction' on his willingness to speak to the officers." (*Id.* at p. 25.) Likewise, in *People v. Clark* (1992) 3 Cal.4th 41, we characterized the defendant's waiver of the right to counsel as selective based on his statement that he was " 'not going to . . . talk any further about [a different crime] without an attorney.' " (*Id.* at p. 122.) The defendant's waiver there only

_____

reiterated—multiple times—that defendant did not have to answer questions. Only after reviewing defendant's rights and explaining the general nature of the interview did Kusch ask defendant if he wanted to "take a few minutes and talk." When defendant clarified his intent, Kusch permissibly continued the interrogation.

encompassed a willingness to speak on the primary crime. (*Ibid.*)

Defendant's statements here did not evince a comparable intent to waive his right to remain silent selectively. Even though his initial expression of willingness to speak with Kusch was dispassionate and arguably directed only to background questions "and stuff like that," defendant continued to answer more substantive questions without any prodding by the officer. He points to nothing in the record that reflects his asserted desire to stop talking about the Jaimes murder. In contrast, there were multiple instances when defendant expressed an unwillingness to discuss events *unrelated* to his role in the Jaimes killing. Kusch asked defendant, for example, about a bullet hole found in the window screen of the motel room; defendant said, "Oh no, no, no, no. I won[']t tell you how that happened." Kusch honored defendant's right not to speak about that. On another occasion, Kusch asked defendant whether there was another person involved; defendant said, "I'll never tell you that man." Kusch, again, did not pursue it. Defendant clearly knew how to exercise his right to remain silent selectively but chose to speak about the Jaimes murder. By willingly answering substantive questions about the crime, defendant impliedly waived his right to remain silent, without any limitation to only background information. (See *Cruz, supra,* 44 Cal.4th at p. 667 [suspect can waive *Miranda* rights impliedly by willingly answering questions after acknowledging an understanding of his rights].)

### c. *Voluntariness of Confession*

Finally, defendant contends that, even if he wholly waived his right to remain silent, his waiver was coerced and

involuntary. The trial court disagreed: It concluded that "based on the totality of the circumstances and [the court's] review of the entire interview process, it appears the defendant definitively, knowingly, intelligently, voluntarily waived his *Miranda* rights and he [was] willing to speak to Lieutenant Kusch based on the prior advisements, based on Lieutenant Kusch's going over the *Miranda* rights again, and based on the defendant's willingness to speak about this incident with Lieutenant Kusch after those rights were given." We agree with the trial court.

In determining whether the prosecution met its burden of establishing by a preponderance of the evidence that defendant's confession was voluntary, we consider the totality of the circumstances. (*Williams, supra,* 49 Cal.4th at p. 436.) "[N]o single factor is dispositive. [Citation.] The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion." (*Ibid.*)

To the extent defendant's argument is premised on Kusch's failure to honor defendant's asserted invocation of his *Miranda* rights, we have already rejected the basis of that claim. Defendant's remaining arguments that Kusch utilized coercive interrogation tactics are belied by the record. At the start of the interview, Kusch reiterated defendant's right to refuse to answer questions, stating, "[Y]ou know whether you choose to answer the questions is completely up to you," and "you know you don't have to answer any questions." Following defendant's initial expression of a dispassionate willingness to speak, defendant actively engaged in the interview. He appeared calm throughout. His confession was vivid, thorough, and largely

without interruption; defendant even acted out part of his altercation with Jaimes and explained how the incident unfolded with reference to visual aids. (Cf. *People v. Parker* (2017) 2 Cal.5th 1184, 1216 [concluding beyond a reasonable doubt that the defendant voluntarily waived his *Miranda* rights where he "actively participate[d] in the conversation with the detectives—answering questions, asking for clarification, and generally contributing to a discussion he knew was being tape-recorded"].) Defendant's clear understanding of his right to remain silent is evidenced by his selective refusal to answer certain questions throughout the interview. Notably, when defendant chose not to answer questions, Kusch respected that choice.

Defendant also contends Kusch made a coercive "implied promise" that defendant could escape a murder charge if he waived his rights. We see no evidence of such coercion in the record. Defendant prompted the mention of murder charges by asking Kusch what charges would be brought against him. Kusch responded candidly that murder was the likely charge, but that there are certain "things that may mitigate" or "justif[y]" a killing and that the ultimate decision would fall to a jury. There was nothing improper or coercive about Kusch's response.

Ultimately, defendant's own statements provide the strongest evidence that his admissions were made of his own free will. Defendant prefaced his confession with the following statement: "I'm gonna tell you what happened. [¶] . . . [¶] *Not because I have to* not because, *I mean because I want to*, ay. Cuz I feel what happened wasn't right ay. You know what I mean? And I feel that I shouldn't even have to be like this because of that. I feel that that's that [*sic*] it wasn't right. And I'm pretty

sure you would do the same thing if you were in my shoes." (Italics added.) Immediately before admitting to the murder, defendant expressed a similar sentiment, saying, "[I]f you guys want to charge me with murder or whatever, I know it's for something righteous and I don't mind that." And after admitting to the murder, defendant said, "I enjoyed doing it ay. I'm gonna tell you why, because it was defending my mother." He repeated this theme later saying, "[L]ike I told you I mean, I'm telling you the story all right because it's righteous and I'd rather you guys convict me." In light of these statements, we see no reason to doubt that defendant's confession was "the product of an ' "essentially free and unconstrained choice." ' " (*Williams*, *supra*, 49 Cal.4th at p. 436.) We hold that, in view of the totality of circumstances—with great weight given to defendant's own statements—the prosecution met its burden of establishing that defendant's confession was voluntary.

## B. Claim of Prosecutorial Misconduct

Defendant claims the prosecutor committed misconduct at the penalty phase by soliciting inadmissible hearsay in her direct examination of Lieutenant Kusch. The prosecutor did err by asking, "Now, did you at some point—well basically Lillian Perez told you basically her son is the one who shot Mr. Jaimes, correct?" Kusch answered, "In short, yes." Defense counsel then objected on hearsay grounds. The court sustained the objection and granted defendant's motion to strike.

To have a conviction or sentence reversed for prosecutorial misconduct, a defendant must show it is reasonably probable that a result more favorable would have been reached without the misconduct. (See *Crew*, *supra*, 31 Cal.4th at p. 839.) Defendant fails to demonstrate any prejudice from the

prosecution's single question soliciting hearsay. The trial court sustained defendant's objection and struck the answer, thereby eliminating any prejudice from the improper testimony. (*People v. Tully*, *supra*, 54 Cal.4th at p. 1038.) Moreover, the prosecution properly introduced defendant's detailed confession to the Jaimes murder, which was corroborated by testimony by a firearms expert, who opined that the same gun was used in the Jaimes murder as in the shooting of defendant's former girlfriend, Mary Muro. Even without the prosecutor's question and Kusch's response, it is highly unlikely the jury would have reached a different result.

## C. Instructions on Mitigating and Aggravating Factors

The trial court instructed the jury to take into account all aggravating and mitigating factors listed in Penal Code section 190.3, factors (a) through (k), "if applicable" in determining the appropriate penalty. As we have consistently held, the jury is capable of deciding which factors are " 'applicable.' " (*People v. Ghent* (1987) 43 Cal.3d 739, 777.) Defendant offers no persuasive reason for us to overturn this settled law.

Defendant further claims the trial court erred by failing to instruct the jury sua sponte that the absence of a mitigating factor is not itself aggravating. Although such an instruction would have been a true statement of the law, we have long held that a court has no duty to give this instruction unless the court or a party suggests that the absence of mitigation is aggravating. (*People v. Livaditis* (1992) 2 Cal.4th 759, 784–785.) There was no such suggestion here.

### D. Eighth Amendment Challenge to the Death Penalty for Those Age 21 and Under

Defendant argues the death penalty may not be constitutionally applied to persons who were 21 years of age or younger at the time of their crimes, as defendant was in this case. Specifically, he argues the death penalty for those 21 and younger is "cruel and unusual" under the Eighth Amendment to the United States Constitution, which has been incorporated against the states through the Fourteenth Amendment.

The United States Supreme Court has held that the Eighth Amendment bars imposition of the death penalty on individuals who were under 18 at the time of their offenses. (*Roper v. Simmons* (2005) 543 U.S. 551, 574 (*Roper*).) Defendant asks us to expand *Roper* to reach those ages 18 to 21, arguing that research shows that young adults suffer from many of the same cognitive and developmental deficiencies as adolescents. We have previously rejected similar arguments, most recently just two years ago in *People v. Powell* (2018) 6 Cal.5th 136, 191. (Accord, *People v. Gamache* (2010) 48 Cal.4th 347, 405.) As we noted in those cases, the high court in *Roper* recognized that the " 'qualities that distinguish juveniles from adults do not disappear when an individual turns 18,' " but nonetheless held that the " 'age of 18 is the point where society draws the line for many purposes between childhood and adulthood' " and is " 'the age at which the line for death eligibility ought to rest.' " (*Powell*, at pp. 191–192, quoting *Roper*, at p. 574.)

Defendant makes no persuasive argument for reconsidering this precedent here. He does point to various developments from the past few years, including a 2018 resolution from the American Bar Association House of Delegates urging the prohibition of the death penalty for those

ages 21 and under (Res. No. 111 (Feb. 2018)); a nonprecedential opinion from a trial court in Kentucky declaring the death penalty unconstitutional for this same group (*Commonwealth v. Bredhold* (Ky.Cir.Ct., Aug. 1, 2017, No. 14-CR-161) 2017 WL 8792559); and the California Legislature's expansion of Penal Code section 3051, subdivision (a)(1), which provides "youth offender parole hearing[s]" to inmates who were 25 or younger at the time of their commitment offense. But these developments do not establish the "national consensus" necessary to justify a categorical bar on the death penalty for individuals between the ages of 18 and 21 at the time of their offenses. (*Atkins v. Virginia* (2002) 536 U.S. 304, 316.) Nor has defendant presented much in the way of new scientific evidence that might be relevant to the issue.

Defendant further contends that, for those ages 18 to 21, a death sentence is inherently unreliable. The United States Supreme Court has recognized that "the features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings." (*Graham v. Florida* (2010) 560 U.S. 48, 78.) Juveniles may, for example, "mistrust adults," "have limited understandings of the criminal justice system," and have trouble "work[ing] effectively with their lawyers to aid in their defense." (*Ibid*.) But, again, the high court has concluded that the federal Constitution draws the line at age 18. (*Id.* at pp. 74–75.) There was no Eighth Amendment violation here.

### E. Constitutionality of California's Death Penalty Law

Defendant claims his death sentence violates the United States Constitution; we reject his contentions, as we have in previous cases. "California's death penalty statute is not

impermissibly broad and adequately narrows the class of death-eligible defendants." (*People v. Brady* (2010) 50 Cal.4th 547, 590.) Penal Code section 190.3, factor (a), which directs the jury to consider the "circumstances of the crime" in determining the penalty, is not unconstitutionally vague, nor does it violate the Eighth Amendment. (*Tuilaepa v. California* (1994) 512 U.S. 967, 980.) The death penalty statute is not unconstitutional because it does not require "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) The absence of written findings by the jury does not render the California death penalty scheme unconstitutional. (*People v. McDowell* (2012) 54 Cal.4th 395, 444.) Nor does the lack of intercase proportionality review. (*People v. Clark* (1993) 5 Cal.4th 950, 1039; *Pulley v. Harris* (1984) 465 U.S. 37, 44.) And the use of restrictive adjectives, such as " 'extreme' " and " 'substantial' " in section 190.3's list of mitigating factors, "does not act unconstitutionally as a barrier to the consideration of mitigation." (*People v. Hoyos* (2007) 41 Cal.4th 872, 927.) The use of the prefatory "whether or not" in certain mitigating factors does not invite the jury to convert those mitigating factors into aggravating circumstances. (*People v. Morrison* (2004) 34 Cal.4th 698, 730.) Capital defendants are not similarly situated to noncapital defendants; thus, providing certain procedural protections to noncapital defendants but not to capital defendants is not unconstitutional. (*People v. Scott* (2011) 52 Cal.4th 452, 497.) The death penalty as applied in California does not violate international law. (*Ibid.*)

The high court's decision in *Roper, supra*, 543 U.S. 551 did not preclude admission of evidence of defendant's juvenile criminal activity as an aggravating factor. (*People v. Taylor* (2010) 48 Cal.4th 574, 653; *Bramit, supra*, 46 Cal.4th at p. 1239.)

The trial court did not err by admitting victim impact testimony evidence from the murder victims' family members. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825.) The prosecution " 'has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Ibid*; see also *People v. Edwards, supra*, 54 Cal.3d at p. 835.)

### F. Cumulative Error

Defendant argues that the claimed errors at trial cumulatively rose to the level of reversible and prejudicial error. Whether considered separately or together, the three or four minor errors at defendant's trial were harmless and did not interfere with his due process right to a fair trial.

### G. Enhancements Imposed Under Penal Code Section 12022.53, Subdivision (d)

In addition to convicting defendant of three counts of first degree murder, the trial jury found true as to each count that defendant personally and intentionally discharged a firearm in violation of Penal Code section 12022.53, subdivision (d) (section 12022.53(d)). Section 12022.53(d) imposes a 25-years-to-life sentencing enhancement for each count as to which it attaches. Because defendant was sentenced to death, the court imposed

but stayed the section 12022.53(d) enhancements. (See Pen. Code, § 654.) When defendant was sentenced, these enhancements were mandatory. (§ 12022.53, former subd. (h).) But the Legislature subsequently passed Senate Bill No. 620 (2019–2020 Reg. Sess.), which amended section 12022.53 to now provide that "[t]he court may, in the interest of justice . . . strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h).) In his second supplemental brief, defendant asks us to remand his case to the trial court for it to exercise the discretion section 12022.53 now provides. The Attorney General concedes that the revision of section 12022.53 applies retroactively to defendant's case but argues a remand is unnecessary here. We agree with the Attorney General.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

The record in this case demonstrates with unusual clarity that remand would be an idle act. (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) At sentencing, the trial court said, "[Q]uite frankly, based on what I know about the defendant and based on what I know the defendant did . . . I think

Mr. Flores does fall into the category of the worst of the worst offenders thereby deserving the ultimate sentence of death." It "believe[d] that in this situation the punishment does fit the crimes based on the senseless murders of four separate individuals, three being charged in the information in this case." Defendant, the court remarked, "show[ed] absolutely no remorse"; "[i]t's as if he has no soul." In the court's "opinion[,] justice will be served" by a death sentence. Given that the trial court explicitly said it thought it "just[]" for defendant to receive a death sentence—the most severe sentence available under California law—it is clear the trial court would not have exercised its discretion to eliminate the firearm enhancements "in the interest of justice," had such discretion been available to it at the time of sentencing (Pen Code., § 12022.53, subd. (h)). Under these circumstances, a remand is not required.[16]

## V. Disposition

We affirm the judgment, including the judgment of death.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**GROBAN, J.**

---

[16] We express no opinion here on the utility of remand for application of Penal Code section 12022.53, subdivision (h) where the record shows the trial court approved of a high sentence short of the death penalty.

PEOPLE v. FLORES

S116307


Concurring and Dissenting Opinion by Justice Liu


During the penalty phase of this case, the trial court admitted a videotaped interrogation in which defendant Alfred Flores confessed to the murder of Mark Jaimes. At the beginning of the interrogation, Lieutenant Roderick Kusch asked Flores if he wanted to talk about the Jaimes murder. Flores responded, "No." His response was an unequivocal invocation of his right to silence, requiring the interrogation to stop. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) But Kusch continued the interrogation, and the evidence obtained was quite damaging: Flores described in detail how he killed Jaimes and said he "enjoyed doing it." Because this evidence was admitted in violation of Flores's right to silence under *Miranda*, the penalty judgment cannot stand.

Today's opinion declines to hold that "No" means no and instead treats Flores's simple one-word answer as a "question[] of interpretation." (Maj. opn., *ante*, at p. 66.) Invoking the truism that "context does matter" (*ibid.*), the court undertakes an exquisite parsing of the interrogation and conjures ambiguity from an implausible reading of ordinary language and from signals so faint as Flores's fleeting smile on a grainy videotape. This is an exercise at which lawyers (especially lawyers in robes) may excel. But the *Miranda* warnings and the rights they secure are for everyday people, and "[i]nterpretation is only required where the defendant's words, understood as ordinary

people would understand them, are ambiguous." (*Connecticut v. Barrett* (1987) 479 U.S. 523, 529 (*Barrett*).)  The right to silence is one of the fundamental ground rules for interactions between citizens and the police.  Today's decision erodes that right and, in its speculative reasoning, sets a dangerous precedent.

## I.

For half a century, it has been settled law that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. . . .   [S]uch a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. . . .  Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." (*Miranda, supra,* 384 U.S. at pp. 467–468.)  "Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Id.* at pp. 473–474.)

In order to invoke the right to silence, the suspect must do so unambiguously from the perspective of a reasonable officer. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381; see *Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).)  A suspect need not " 'speak with the discrimination of an Oxford don' " in order to invoke *Miranda* rights, but the suspect must speak "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be" an invocation.  (*Davis*, at p. 459; see *ibid.* ["this is an objective inquiry"].)

When a suspect has clearly expressed a desire not to talk, "it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself . . . not the purely voluntary choice of the suspect." (*Arizona v. Roberson* (1988) 486 U.S. 675, 681.) The reason is that "subsequent requests for interrogation" in the face of a clear invocation "pose a significantly greater risk of coercion. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated — pressure likely to 'increase as custody is prolonged.' " (*Maryland v. Shatzer* (2010) 559 U.S. 98, 105.) Any statements or evidence obtained in disregard of a suspect's invocation of the right to silence are inadmissible. (*Michigan v. Mosley* (1975) 423 U.S. 96, 104.)

## II.

Applying an objective inquiry, I see no ambiguity in Flores's invocation of his right to remain silent. Lieutenant Kusch asked Flores if he wanted to speak about the Jaimes murder, and Flores's response, "No," indicated that he did not want to speak about it.

Today's opinion accurately recounts the portion of the interrogation at issue. (Maj. opn., *ante*, at pp. 61–62.) From the beginning, Kusch made clear to Flores that he planned to ask him about a Los Angeles case that occurred on November 17, 2000 — i.e., the Jaimes homicide. Kusch began, "I'm Rod Kusch uh one of the investigators on a case that happened out in Maywood [in Los Angeles County] . . . . [T]he case I'd like to take a minute and chat with you about uh is uh a case we're investigating happened back on November 17th back in uh

2000. So pushing close to a year about nine months I guess right about now or so." He repeated his intention to ask about the Jaimes homicide by saying, "I can tell you right now that we in Los Angeles County do not have a warrant for your arrest on any case that I'm investigating. So uh I didn't or I wanted to have an opportunity to chat with you first and uh try to clear up some loose ends and try to get a clear picture of what happened." Kusch then read Flores his *Miranda* rights and confirmed that Flores understood them. Next, Kusch asked Flores the critical question: "Basically *what I'd like to do is talk about the case that we investigated that we got called out on back on November 17th, 2000.* Uh I'll tell you how we got called out on it in a minute but uh do you want to take a few minutes to talk a little bit about *that*?" (Italics added.) Flores answered, "No." Today's opinion says the answer sounds more like "Nah" on the videotape (maj. opn., *ante*, at p. 62), but no one disputes that "Nah" is synonymous with the word "No," which is what appears in the transcript.

There is no ambiguity in this exchange. The word "that" at the very end of Kusch's question plainly refers to "the case" that the Los Angeles Police Department (LAPD) "got called out on back on November 17th, 2000," which was the Jaimes homicide. Flores's answer, "No," indicated he did not want to talk about it. At that point, Kusch was required to stop all questioning regarding the Jaimes murder. Instead, Kusch rephrased his question and continued the interrogation until he eventually elicited a confession from Flores. Today's opinion characterizes Kusch's question immediately following Flores's "No" as merely a clarifying question. (Maj. opn., *ante*, at p. 66 & fn. 12.) But whether Kusch's subsequent question was intended to clarify Flores's response or to ignore it is irrelevant

for purposes of determining whether it was constitutionally permissible. The high court has repeatedly held that "[w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." (*Smith v. Illinois* (1984) 469 U.S. 91, 98; see *Fare v. Michael C.* (1979) 442 U.S. 707, 719 ["[A]n accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease."]; *Miranda, supra,* 384 U.S. at pp. 473–474 ["If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."].)

While acknowledging that the word "no" in response to whether a suspect wishes to speak with the police will "generally constitute[] an unambiguous invocation," the court says that "here, considered in context, neither the question asked, nor the answer given was this simple . . . ." (Maj. opn., *ante*, at p. 66.) Of course, context matters. But none of the contextual circumstances discussed in today's opinion comes close to suggesting that Flores's "No" could have meant something other than that he did not want to talk about the Jaimes murder.

First, today's opinion posits that when Kusch asked Flores if he wanted to "talk a little bit about that," Kusch could have been asking Flores "whether he was willing to answer questions about the Jaimes case or whether defendant wanted to talk about how 'we got called out on it.' " (Maj. opn., *ante*, at pp. 67–68.) Because the question was ambiguous, the court says, a reasonable officer could have interpreted Flores's response to mean either, " 'No, I do not want to talk to you at all,' or 'No, I do not want to hear about how the police got called out.' " (*Id.* at p. 68.) But this reading of the interview evinces "a disregard

of the ordinary meaning of [Kusch's and Flores's] statement[s]." (*Barrett, supra*, 479 U.S. at p. 530.) The plain language and flow of Kusch's prefatory statements, in the transcript and on videotape, leave no doubt that he was asking Flores to talk about the Jaimes murder when he asked if Flores wanted to "talk a little bit about that."

Recall that Kusch immediately prefaced his question by saying he would "tell [Flores] how we got called out on [the case] in a minute," thereby indicating that Kusch was tabling that topic for later. So, when Kusch asked in the next clause, "do you want to take a few minutes to talk a bit about that," he was plainly asking Flores if he wanted to talk about the case itself. Kusch's question was not an offer to share information with Flores; it was an invitation for Flores to speak. The court compares Kusch's phrasing to "the age-old 'We need to talk'" (maj. opn., *ante*, at p. 68, fn. 13), but this was a police interrogation, not a heart-to-heart. A reasonable officer would not interpret Flores's response to mean, " 'No, I do not want to *hear* about how the police got called out.' " (*Id.* at p. 68, italics added.)

Equally important, consider the context of the question: Having opened the interrogation by saying he wanted "to get a clear picture of what happened" in a case that occurred on November 17, 2000, why would Kusch then ask Flores whether he wanted to hear about how the LAPD "got called out" on the case? Kusch already knew how the LAPD got called out; his stated objective was to get Flores to talk about "what happened" in the homicide. No reasonable officer could have understood the exchange as anything but an effort to ask Flores to discuss the case itself, not how the LAPD got called out. Indeed, a firsthand witness to the interrogation — a police officer no less

— confirmed this understanding: Sergeant Robert Dean, who monitored the interview in real time, testified that "[a]t one point . . . . Lieutenant Kusch asked Mr. Flores if he wanted to talk about that, *meaning the Maywood murder*, and Alfred replied, 'No.' " (Italics added.)

Today's opinion speculates that because Flores's mother "played a central role" in the LAPD's investigation of the crime, how the LAPD "got called out on" the murder "may have been a subject of particular personal importance to defendant." (Maj. opn., *ante*, at p. 69.) To be clear, Flores's mother did not play a central role in how the LAPD "got called out on" the case. Kusch and the LAPD were alerted to the Jaimes homicide by Rick Milam, who had discovered Jaimes's body in the trunk of his car. Only after Kusch had begun investigating the case, identified the body, and interviewed Jaimes's family members did Kusch learn that Milam and Jaimes had been clients of Flores's mother and that Milam's car had disappeared while Milam was with Flores's mother in a motel room.

But even assuming that the topic of how the LAPD "got called out" would have involved a reference to Flores's mother, the court's reliance on this point is unpersuasive for the simple reason that Flores's mother played a central role in the events surrounding Jaimes's murder itself. On the night Jaimes was killed, he had solicited Flores's mother as a prostitute and refused to promptly leave the motel where Flores and his mother were living when Flores confronted him. (Maj. opn., *ante*, at p. 8.) Kusch knew these facts because he had interviewed Flores's mother before the interrogation, and she had recounted the events of the Jaimes murder to him. So, any sensitivity Flores might have had about his mother could not have led a reasonable officer in Kusch's position to infer that Flores's "No"

was a refusal to hear about how the LAPD got called out on the case as opposed to a refusal to talk about the Jaimes murder. To the contrary, given the tangential role of Flores's mother in how the LAPD got called out and her far more significant role in the events leading to the Jaimes murder itself, any such sensitivity would have bolstered the plain meaning of Flores's "No": He did not want to talk about the Jaimes murder.

Second, the court notes that Flores answered Kusch's question with "a casual-sounding 'no,' or, perhaps, 'nah'; as he says this, defendant is still smiling and gives a short laugh. The dissonance between defendant's bemused demeanor and his spoken response is confusing; the combined effect is murky and unclear." (Maj. opn., *ante*, at pp. 69–70.) This is a remarkable dissection of a fleeting snippet of grainy video footage recorded almost 20 years ago on VHS cassette tape. Having watched the tape, I see no lack of seriousness in Flores's response to Kusch's question. But even accepting the court's description of Flores's demeanor, these faint cues (which seem indicative of nervousness more than anything else) are not remotely sufficient to cast doubt on Flores's spoken word, "No." (See *Barrett*, *supra*, 479 U.S. at p. 529 ["Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous."].) After today's decision, ordinary people must beware: If you say "no" when the police ask if you want to talk, your answer better not be too "casual-sounding," and you better not "smil[e]" or "laugh" or betray, in a judge's estimation, a "bemused demeanor." (Maj. opn., *ante*, at pp. 69–70.)

This aspect of the court's opinion is especially misguided because judges are not theater critics and suspects facing custodial interrogation are not method actors. I would like to

8

believe that today's decision is "a narrow one, based on the particular circumstances surrounding the interrogation in this case." (Maj. opn., *ante*, at p. 76.) But I fear it portends further erosion of *Miranda* rights. Under its reasoning, interrogating officers, whether unscrupulous or well intentioned, need not take "no" for an answer if they can parse a suspect's intonation, facial expression, or body language for hints of uncertainty. In cases without a videotape, courts will have little basis to reject an officer's sworn testimony that a suspect's refusal to talk, as indicated by the word "no," was "confusing," "murky," or "unclear" in light of the suspect's demeanor and therefore warranted further questioning to "clarify [the] defendant's intent." (Maj. opn., *ante*, at p. 70.) We should not open the door to such "interpretation" (*id.* at p. 66) when the suspect has used clear language.

Third, the court explains that because Kusch knew Flores had willingly talked the previous day about the murders of Ricardo Torres, Jason Van Kleef, and Alexander Ayala, a reasonable officer in Kusch's position would have had no reason to think Flores would be unwilling to talk about the Jaimes murder as well. But this gets the presumption backwards: The law "presume[s] that a defendant did not waive his rights" (*North Carolina v. Butler* (1979) 441 U.S. 369, 373), and "[a] person may invoke his *Miranda* rights selectively" (*People v. Suff* (2014) 58 Cal.4th 1013, 1070). The fact that Flores previously agreed to talk about a different case to different officers the day before does not raise a presumption that he was willing to talk about the Jaimes murder. (See *Anderson v. Terhune* (9th Cir. 2008) 516 F.3d 781, 788 (en banc) (*Anderson*) ["[T]he fact that [the defendant] had answered the officers' questions for over two hours does not somehow undermine or

cast doubt on an unambiguous invocation."].)  And even if some presumption could have been drawn by Flores's willingness to talk about a different case, it was certainly overcome when Flores said, "No."

Finally, today's opinion compares this case to *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203 (*Sauceda-Contreras*) and *People v. Williams* (2010) 49 Cal.4th 405 (*Williams*), both of which held that asserted *Miranda* invocations were ambiguous. Both cases are distinguishable.

In *Sauceda-Contreras*, a detective read the defendant his *Miranda* rights and then asked through a translator:  " 'Having in mind these rights . . . , the detective would like to know if he can speak with you right now?' " (*Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 216.)  Sauceda-Contreras responded:  " 'If you can bring me a lawyer, that way I[,] I with who . . . that way I can tell you everything that I know and everything that I need to tell you and someone to represent me.' " (*Ibid.*)  We held that Sauceda-Contreras's invocation was "conditional, ambiguous, and equivocal" based on a number of facts, not just the nature of the detective's question.  (*Id.* at p. 219.)  We said, "It was conditional in that it began with an inquiry as to whether a lawyer could be brought to defendant.  By responding '[*i*]*f you can* bring me a lawyer . . .' (italics added), defendant was expressly asking the officer whether a lawyer could be brought to him, and impliedly asking whether one could be provided right now, given that the officer had asked him if he would speak with Detective Blazek 'right now.'  It was equivocal in that defendant went on to plainly state his intent and desire to waive his right to remain silent and 'tell you everything that I know and everything that I need to tell you,' but then ended his response ambiguously with the words 'and someone to represent

me.' From an objective standpoint, a reasonable officer under the circumstances would not have understood defendant's response to be a clear and unequivocal request for counsel." (*Ibid*.) Flores's one-word statement, "No," is nothing like the defendant's winding statement in *Sauceda-Contreras*. Moreover, *Sauceda-Contreras* did not rely on non-verbal cues to find ambiguity as today's opinion does.

In *Williams*, after an interrogator read the defendant his *Miranda* rights and confirmed his understanding of them, the following exchange occurred:

"[Interrogator]: 'Do you wish to give up your right to remain silent?'

"[Williams]: 'Yeah.'

"[Interrogator]: 'Do you wish to give up the right to speak to an attorney and have him present during questioning?'

"[Williams]: 'You talking about now?'

"[Interrogator]: 'Do you want an attorney here while you talk to us?'

"[Williams]: 'Yeah.'

"[Interrogator]: 'Yes you do.'

"[Williams]: 'Uh huh.'

"[Interrogator]: 'Are you sure?'

"[Williams]: 'Yes.'

"[Interrogator]: 'You don't want to talk to us right now.'

"[Williams]: 'Yeah, I'll talk to you right now.'

"[Interrogator]: 'Without an attorney.'

11

"[Williams]:     'Yeah.' "

(*Williams, supra*, 49 Cal.4th at p. 426.)

We concluded that Williams's request for counsel was ambiguous because "[h]e already had agreed to waive his right to remain silent, and his question ['You talking about now?'] suggests to us that his willingness to waive the assistance of counsel turned on whether he could secure the presence of counsel immediately." (*Williams, supra*, 49 Cal.4th at p. 426.) Here, by contrast, Flores did not ask Kusch any questions suggesting that his willingness to waive his right to silence was conditional. His response to whether he wanted to talk about the Jaimes case was simply "No."

In sum, there is nothing ambiguous or confusing in the words spoken by Kusch and Flores "as ordinary people would understand them." (*Barrett, supra*, 479 U.S. at p. 529.) Kusch asked Flores a yes-or-no question about whether he wanted to speak about the Jaimes case. Flores said, "No." I am unsure how an ordinary person (or even an Oxford don) could have more clearly expressed his desire to remain silent. As for "context," the Ninth Circuit put it well in an en banc opinion rejecting a California decision purporting to find ambiguity on interpretive grounds similar to those offered by the court today: "Using 'context' to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law. It is not that context is unimportant, but it simply cannot be manufactured by straining to raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence." (*Anderson, supra*, 516 F.3d at p. 787.) Because there was nothing in Flores's response for Kusch to clarify, Kusch's continued questioning of Flores

violated *Miranda*, and the trial court erred in admitting Flores's self-incriminating statements about the Jaimes homicide.

## III.

The error was not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) During the penalty phase, the prosecution introduced evidence that Flores committed several crimes unrelated to the three murders, including brandishing a gun while driving to a birthday party, assaulting a correctional officer while a ward at a youth correctional facility, participating in the nonfatal shooting of his ex-girlfriend, stabbing his sister's boyfriend, committing two armed robberies with other El Monte Trece gang members, possessing a "slashing type weapon" while in custody, and murdering Jaimes. The prosecution also introduced victim impact statements from members of the Torres, Van Kleef, and Ayala families.

In mitigation, Flores introduced evidence of the harsh conditions for prisoners sentenced to life without parole, as well as the low risk of escape in the prisons housing such inmates. Retired police officer Steven Strong testified that individuals from "broken homes" like Flores's often joined gangs at a young age and learned to resolve problems through violence. Strong read transcripts of interviews with Flores's mother, father, two sisters, and the adoptive mother of his youngest brother. Based on these interviews, Strong testified that Flores had an unstable childhood and was "bounced around . . . from different family members to social services." At the age of two, Flores was separated from his brother, who was adopted by another set of parents. Both of Flores's parents were imprisoned for drug offenses, and at the age of 11 or 12, Flores became involved in

gang life because the authority figures he lived with were in gangs.

In view of the evidence offered at trial, there is a reasonable possibility that exclusion of the Jaimes confession tape would have resulted in a different verdict. First, the hour-long taped interrogation provided the only direct evidence that Flores killed Jaimes. During the penalty phase, the jury heard Flores confess, "I murdered him [Jaimes] ay. I did it. All right? And I enjoyed doing it ay," and "I pulled out my gun and I blew his fucking head off ay." Flores then described the events leading up to the murder and his motivation for killing Jaimes. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.) Although the prosecution also introduced circumstantial evidence to corroborate Flores's statements on the tape, the tape itself provided the primary evidence and motivation for the murder.

Second, although the prosecution presented evidence that Flores may have committed a number of prior offenses during the penalty phase, the Jaimes murder was the most serious. During closing argument, the prosecution recounted several of Flores's past offenses and then said, "But it didn't end there, and we know that. Because there had to be something even worse. And even worse is the murder of Mark Jaimes." The prosecution went on to devote a significant amount of its closing argument to discussing the murder.

Finally, the Jaimes confession may have been particularly weighty because it erased any lingering doubt the jury may have had that Flores committed multiple murders. The evidence in

14

support of Flores's guilt for the murders of Van Kleef and Ayala was rather thin. Two witnesses, Andrew Mosqueda and Carmen Alvarez, provided much of the testimony implicating Flores in the Van Kleef and Ayala murders during the guilt phase and much of the testimony that Flores committed past offenses during the penalty phase. During the penalty phase, Flores impeached both witnesses based on contradictions between their guilt and penalty phase statements. To the extent that these contradictions sowed doubt in the jury about its multiple-murder finding, the Jaimes confession made clear that Flores committed multiple murders, which qualified him for the death penalty. In sum, the erroneous admission of Flores's confession was not harmless beyond a reasonable doubt.

I join the portions of today's opinion affirming Flores's convictions, but for the reasons above, I would vacate the judgment of death.


**LIU, J.**


**I Concur:**

**CUÉLLAR, J.**


15

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Flores

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S116307
**Date Filed:** May 4, 2020

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Ingrid Adamson Uhler


_____

**Counsel:**

Robert H. Derham, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala Harris and Xavier Becerra, Attorneys General, Ronald S. Matthias, Julie L. Garland and Dane R. Gillette, Assistant Attorneys General, Holly D. Wilkens, Heather F. Crawford, Ronald A. Jakob and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert H. Derham
Attorney at Law
369-B Third St., #364
San Rafael, CA 94901
(415) 485-2945

Heather Clark
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9033